LOEWE et al. v. CALIFORNIA STATE FEDERATION OF LABOR et al.

(Circuit Court, N. D. California. July 1, 1905.)

1. CONSPIRACY—CONCERT OF ACTION TO INJURE BUSINESS OF ANOTHER—BOYCOTT.

The fact that the ultimate object of a combination is to benefit the parties thereto in their business or property, which is in itself lawful, will not prevent such combination from being an unlawful conspiracy, where its immediate object and purpose is to injure or destroy the business of another by means of a boycott; nor is such combination rendered lawful because the acts contemplated and done pursuant thereto might lawfully be done by an individual acting for himself alone.

[Ed. Note.—For cases in point, see vol. 10, Cent. Dig. Conspiracy, §§ 7, 10.]

2. SAME—RIGHT TO INJUNCTION.

The concerted action of labor organizations, state and local, in declaring a boycott against the business and goods of a manufacturer of another state, to compel him to unionize his business, as demanded by an affiliated organization, followed by the sending out of circulars and agents announcing such action, and that dealers buying or selling the goods of the manufacturer will also be treated as "unfair," and by attempts by other means to interfere with and destroy his business, constitutes an unlawful conspiracy, which the courts will enjoin.

[Ed. Note.—For cases in point, see vol. 27, Cent. Dig. Injunction, §§ 174, 175.]

In Equity. On motion for preliminary injunction.

Bill of complaint by D. E. Loewe & Co., of Danbury, Conn., against the California State Federation of Labor and others. On order to show cause why a temporary injunction should not issue, restraining the defendants from boycotting complainants' business.

Francis J. Heney, for complainants.

James G. Maguire and E. T. Barrett, for the California State Federation of Labor and certain other defendants.

Cleveland L. Dam and Charles S. Burnell, for the Building Trades Council of San Francisco and certain other defendants.

MORROW, Circuit Judge. This is an order to show cause why an injunction pendente lite, should not issue, restraining the defendants from in any manner conspiring together to destroy the trade and business of complainants; from boycotting the complainants' business or the product of their factory; from publishing or otherwise circulating statements or representations calling the attention of complainants' customers or of dealers or of tradesmen or of the public to any boycott or strike against the complainants; from threatening or intimidating the customers of complainants

or the public or persons buying from complainants, or persons buying the products of complainants' factory from any other person, firm, or corporation, by any means alleged in the bill of complaint. A hearing has been had upon the bill of complaint, and affidavits in support thereof, and affidavits on the part of the defendants. An answer to the bill has not yet been filed.

The bill alleges that the complainants are domiciled in, and are citizens of, the state of Connecticut, and are copartners, located and doing business as manufacturers and sellers of hats, under the firm name and style of D. E. Loewe & Co., at Danbury, Conn.; that the defendants California State Federation of Labor, San Francisco Labor Council, and Building Trades Council of San Francisco are voluntary unincorporated associations, composed of persons voluntarily combined and associated together for their common benefit, and governed by officers and agents selected by the members of said associations, and that all the defendants and all the members of said associations are citizens of the state of California; that complainants during all the times mentioned in the bill of complaint have had a factory at Danbury for the making of hats for sale by them in the various states of the Union, and have for many years employed at said factory a large number of men in the manufacture and sale of hats, and have invested in that branch of their business a large amount of capital; that complainants, in their business of selling the product of said factory and filling orders for hats, had in the year 1902 built up and established a large trade, employing more than 230 persons, making and selling annually hats of a value exceeding $400,000, and that at the time of filing the bill of complaint complainants employed about 200 persons in the hat manufacturing business, and that said business was then of the value of about $250,000 annually; that complainants have for many years been engaged in trade and commerce among the several states of the Union, in selling and shipping the product of their factory by common carriers from Danbury, in the state of Connecticut, to wholesale dealers doing business in each of the states of Maine, Massachusetts, Rhode Island, New York, New Jersey, Pennsylvania, Maryland, Virginia, Ohio, Illinois, Michigan, Wisconsin, Missouri, Nebraska, Arkansas, and other states, to the amount of many hundred thousands of dollars, and in sending agents with samples from Danbury into and through each of the said states to visit the wholesale dealers at their places of business in each of the several states, and to solicit and procure from them orders for hats to be manufactured by complainants at Danbury, Conn., and shipped by complainants by common carriers to said wholesale dealers, to be by them paid for after the delivery thereof at their several places of business; that complainants are almost wholly dependent upon the sale and shipment of hats to the dealers in states other than Connecticut to keep their factory running and dispose of its product, and to keep their capital in said business profitably employed, and the restraint, curtailment, and destruction of their trade and commerce with their customers in said states by the combination, conspiracy, and acts

of the defendants, as set forth in the bill of complaint, has been and was at the time of the filing of the bill of complaint of serious damage to the property and business of the complainants, as set forth in the bill.

It is alleged that the Building Trades Council of San Francisco, the San Francisco Labor Council, and the California State Federation of Labor, their officers and members, bind and tie together all the local unions and their members by consent and agreement for united and concerted action in all matters affecting their common interest, including the ordering, prosecution, and furtherance of strikes and boycotts, and including also the acts charged in the bill of complaint against the defendants; that these acts are enforced against their own members, and also against members of local unions, by the defendants, their officers and executive bodies, and by said local unions and their officers, by means of fines, expulsions, and other penalties, and by threats and coercion, and against tradesmen in particular, and the public generally, by means emanating from the same sources—of strikes, boycotts, threats, coercion, and intimidation. It is further alleged that there is in nearly every state of the Union, and in every state and place where complainants do business, and sell or trade in or manufacture hats, a complete organization of labor into local unions, similar to those within the state of California, which in turn are bound together by central labor bodies, and said central labor bodies in California and in each of the other states of the Union are, by their rules, customs, and regulations, bound in obedience to a great central body or chief combination, known as and called the American Federation of Labor, having jurisdiction over all classes of labor throughout the United States, and having in the neighborhood of 2,000,000 members, of which all the individual defendants in this case, and all the members of the local unions, the California State Federation of Labor, the Building Trades Council of San Francisco, the San Francisco Labor Council, and all of said local and state central bodies or combinations, are members; that this combination is subdivided into subordinate groups and combinations, comprising 110 national and international unions or combinations, of which the combination of persons styling themselves the United Hatters of North America is one, and of which others are the California State Federation of Labor, the Building Trades Council of San Francisco, and the San Francisco Labor Council and others, composed of 12,000 local unions, 28 state federations or combinations, more than 500 central labor unions or combinations, and more than 2,000 local unions or combinations. The bill alleges in detail the method adopted by the combination the United Hatters of North America, the American Federation of Labor, and the San Francisco Labor Council in the publication of newspapers and the employment of agents for the purpose of enforcing boycotts, and to force all manufacturers of fur hats in the United States, including complainants, to unionize their factories, by restraining and destroying their interstate trade and commerce. It is further alleged in the bill that said combination

owns and absolutely controls the use of a certain label or distinguishing mark which it styles the "Union Label of the United Hatters of North America," which mark, when so used by them, affords to them a ready and effective instrument and means of boycotting the hats of any manufacturer against whom they may desire to use it for that purpose. It is alleged that the defendants, together with the other persons named in the bill, and united in said combinations known as the American Federation of Labor and the United Hatters of North America, have been for many years engaged in a combined scheme and effort to force all manufacturers of fur hats in the United States, including the complainants, against their will and previous policy of carrying on their business, to organize their workmen in the departments of making and finishing in each of their factories into an organization to be part and parcel of the said combination known as the United Hatters of North America, or, as the defendants and their confederates term it, to unionize their shops, with the intent thereby to control the employment of labor in and the operation of said factories, and to subject the same to the control and direction of persons other than the owners of the same, in a manner extremely onerous and distasteful to such owners, and to carry out such schemes, effort, and purpose by restraining and destroying the business, trade, and commerce of such manufacturers by means of intimidation of and threats made to such manufacturers and their customers in the several states of boycotting them, their product and their customers, using therefor all the powerful means at their command, until such time as from the damage and loss of business resulting therefrom the said manufacturers should yield to the said demand and unionize their factories.

The bill alleges that on or about March 1, 1901, in pursuance of the general scheme and purposes set forth in the bill, the United Hatters of North America, through their agents, demanded of the complainants that they should unionize their factory in the making and finishing departments, and also thereby acquire the right to use in all hats made by them the said union label, subject to the right of said last-mentioned combination to recall the same at pleasure, and notified complainants that, if they failed to yield to said demand, they and all the members of the said combination known as the United Hatters of North America would resort to their usual and well-known methods to compel them to do so; that the complainants refused to comply with this demand, believing that they were acting for the best interests of Danbury and their employés by operating an independent, open factory, and they declined to have their shop unionized. The bill further alleges that about July 25, 1902, the individuals composing the combinations of the United Hatters of North America and the American Federation of Labor, in pursuance of the general scheme and purpose to force all manufacturers of fur hats, and particularly the complainants, to unionize their factories, wantonly, wrongfully, maliciously, unlawfully, and with intent to injure the property and business of the complainants by means of acts which were unlawful and illegal,

and also by other means and doings, entered into a combination and conspiracy to restrain the complainants and their customers in Connecticut and other states, including California, from carrying on said trade, commerce, business, and manufacture, and to wholly prevent the complainants from selling their hats to wholesale dealers and purchasers in said states, or any of them, and to prevent the said dealers and customers from buying the same, and to prevent the complainants from obtaining orders for their hats from such customers and from filling the same, and from shipping hats to said customers, and thereby to injure the complainants in their property and business, and to render unsalable the product and output of their factory, in whosoever's hands the same might be or come, and to employ as means to carry out said combination and conspiracy, and the purposes thereof, and accomplish the same, the measures and acts in the bill alleged, namely, to cause, by means of threats and coercion, the concerted and simultaneous withdrawal of all makers and finishers of hats then working for the complainants, whether members of the combination the United Hatters of North America, or not; to declare a boycott against all hats made for sale by the complainants, and the business of those who should deal in them; to intimidate wholesale dealers from purchasing or dealing in the hats of the complainants by informing them that the American Federation of Labor had declared a boycott against the product of the complainants and against any dealer who should handle it, and by distributing circulars containing notices to such dealers of the boycott; to threaten to boycott any persons who should buy any goods whatever, even if union made, of such boycotted dealers; to falsely represent to such wholesale dealers and their customers that complainants had discriminated against the union men in their employ, had thrown them out of employment because they refused to give up their union cards and teach boys who were intended to take their places after seven months' instruction, and had driven their employés to extreme measures "by their persistent, unfair, and un-American policy of antagonizing union labor, forcing wages to a starvation scale, and giving boys and cheap, unskilled foreign labor preference over experienced and capable union workmen," in order to intimidate dealers from purchasing such hats by reason of the prejudice thereby created against the complainants and the hats made by them among those who might otherwise purchase them; to use the union label of the United Hatters of North America as an instrument to aid them in carrying out such conspiracy and combination against the complainants and their customers, and for the purpose of describing and identifying the hats of the complainants, and singling them out to be boycotted; to employ a large number of agents to visit the wholesale dealers and their customers at their several places of business, and threaten them with loss of business if they should buy or handle the hats of the complainants, and thereby prevent them from buying said hats; to cause said dealers to be waited upon by committees representing large combinations of persons in their several localities to make similar threats to them; to use the public press

in the localities where such wholesale dealers reside and do business to announce and advertise the boycott against the hats of the complainants and such wholesale dealers, and thereby make the same more effective and oppressive; to use the columns of their said paper, the Journal of the United Hatters of North America, and also the other papers specifically mentioned in the bill, for that purpose, and to describe the acts of the agents in prosecuting the same.

The bill further alleges in detail the numerous acts, doings, and proceedings, of the combinations and associations mentioned in the bill, and the acts and doings of the defendants individually, as members and agents of said combinations and associations, in carrying into effect the conspiracy mentioned in the bill. It is alleged that such acts and doings of the defendants have been continuous, and are being continued by them, to the great damage and detriment of the complainants. It is alleged that, by means of each and all of such acts done by the defendants in pursuance of the conspiracy, they have greatly restrained, diminished, and in many places destroyed the trade and commerce of the complainants with the wholesale dealers and others in the state of California, and by reason of the acts of the defendants and the other conspirators the complainants have suffered great and irreparable damage, in the sum of more than $100,000; that the natural and inevitable result will be that complainants will be unable to dispose of their goods in California, causing them great and irremediable injury and loss of business, and that said damage is irreparable, in this: that the same can never be ascertained, and for the reason that, as complainants are advised and believe, and therefore allege the fact to be, the defendants, and each and all of them, are insolvent and unable to respond in damages; that the defendant combinations in California are composed of many thousands of individuals, and that complainants do not know the names or addresses of any of them, other than those individuals named in the bill; that it would require a great number of actions at law in order to recover the damages; and that complainants have no plain, speedy, or adequate remedy at law.

The bill prays for an injunction with respect to all the acts of conspiracy and boycotting alleged in the bill.

The bill is supported by affidavits from which it appears that Triest & Co., a corporation engaged in business in San Francisco as a jobber of hats, has for many years dealt extensively in hats manufactured by D. E. Loewe & Co., of Danbury, Conn.; that these hats have given the best of satisfaction to the customers of Triest & Co.; that about two years ago the corporation was boycotted by the labor organizations of San Francisco because it dealt in the hats manufactured by Loewe & Co., and the San Francisco Labor Council has issued circulars declaring the boycott, which has been indorsed by the California State Federation of Labor and by the state federations and central labor unions and bodies throughout California, Washington, and Oregon, and has been actively enforced by local unions and their members throughout all of that

territory; that circulars have been sent broadcast throughout California, Washington, and Oregon, declaring both Loewe & Co. and Triest & Co. unfair, and that both firms will be retained on the unfair list of the San Francisco Labor Council, the California State Federation of Labor, and the state federations and central labor bodies of California Washington, and Oregon, as long as Loewe & Co. remain unfair, and as long as Triest & Co. continue to patronize that firm; that these circulars have been distributed at various intervals since July, 1903, to all of the customers of Triest & Co. in the states of California, Washington, and Oregon; that the agents of the labor organizations have personally visited the customers of Triest & Co. in San Francisco and Oakland, and the majority of their customers throughout the states of California, Washington, and Oregon, and demanded of them that they cease to deal with Triest & Co., because Triest & Co. continued to patronize Loewe & Co., who, it was stated, were antagonistic to organized labor, and who have been declared unfair by the United Hatters of North America; that these agents have made many statements to the customers of Triest & Co. which were untrue, aud used the means at their command to induce and compel such customers to stop dealing with them, including statements that the registered union labels which were in Triest & Co.'s union-made hats were counterfeit labels, in imitation of that of the United Hatters of North America. It was further represented that the union men were thrown out of the factories of Loewe & Co. in August, 1902, and are now walking the streets; that Triest & Co. promised to cease buying of Loewe & Co., but that they have broken their faith in that regard. It is stated in the affidavits that all of these statements were false. It is further stated that these agents in many cases threatened the customers of Triest & Co. that unless they ceased patronizing Triest & Co. they themselves would be considered as antagonistic to union labor, and that they would be boycotted, and that labor-union men would not trade with them; that this representation was made with the express purpose of coercing and intimidating the customers of Triest & Co. to comply with the demands of these agents not to trade with that corporation; that in many instances these agents of the labor organizations caused customers of Triest & Co. to be declared unfair by local labor organizations for not refusing to patronize Triest & Co., also for the express purpose of aiding the boycotting of Loewe & Co. by the United Hatters of North America.

It is further alleged that the defendants San Francisco Labor Council and others, through their officers and agents, have adopted and maintained in the state of California, and particularly in the cities of San Francisco and Oakland, a system of picketing and espionage upon the shipments by Triest & Co. of hats manufactured by D. E. Loewe & Co. to retail dealers, and also upon other shipments of Triest & Co., and have followed such shipments through the hands of common carriers by the aid of their employés, many of whom are also members of the labor organizations comprising the American Federation of Labor, and upon the arrival of such ship-

ments at their destination they have visited the dealers to whom such shipments were consigned, and have threatened the dealers that unless they returned such shipments, and also unless they refused to purchase hats from Triest & Co. they (the dealers) would be boycotted, and their business greatly injured, if not wholly ruined; that many of such purchasers of Loewe & Co.'s hats, through fear of the threats of these agents, acceded to their demands, and refused to trade or to deal with Triest & Co.; that an agent of the United Hatters of North America has recently come to San Francisco to enforce the boycott against Loewe & Co., and is prepared forthwith to commence with renewed vigor active measures in prosecuting the boycott against the goods of Loewe & Co. and against Triest & Co. The effect of these measures adopted by the labor organizations throughout the state of California was to frighten many of the customers of Triest & Co. into canceling orders given that corporation for hats. Many shipments which had been made to customers of Triest & Co., consisting of union-made goods, as well as goods manufactured by Loewe & Co., were returned, and some of the customers have ceased to deal with them and to purchase any of the Loewe hats, to the great damage of Loewe & Co., as well as of Triest & Co. It is alleged that one of these agents of the labor organizations declared to an officer of Triest & Co. that they (the labor organizations) were after Loewe & Co., and he wanted to know whether Triest & Co. had a contract with Loewe & Co. Upon being informed that there was no contract, the agent demanded that Triest & Co. should cancel its orders placed with Loewe & Co. and promise not to buy from Loewe & Co. as long as the United Hatters had Loewe & Co. on their unfair list. The agent stated further that Triest & Co. used three-fourths of the output of Loewe & Co.'s factory, and, if Triest & Co. would promise not to buy from Loewe & Co., they (the labor organizations) would have no trouble in unionizing Loewe & Co.'s factory. It is alleged further that one of these agents stated to an agent of Triest & Co. that they (meaning the United Hatters of North America) had $100,000 at their disposal with which to break up Loewe & Co. and Triest & Co., even if it took them one, two, or three years to accomplish this purpose. It is further alleged that this agent said they (the labor organizations) had succeeded in breaking up harder cases than these.

At the hearing the complainants introduced the affidavit of one Herman Welisch, engaged in business in San Francisco as a dealer in clothing, hats, and furnishing goods for men. He was a customer of Triest & Co., and had been notified by the San Francisco Labor Council that Triest & Co. were on the unfair list. Welisch alleges that he was afterwards boycotted, and his place of business picketed. But it appears from the affidavit of Russell J. Wisler, secretary of the San Francisco Labor Council, that this boycotting was not done by any labor organization, but by representatives of the Retail Clerks Union, by reason of some disagreement between Welisch and his employés concerning the hours he kept his place of business open. The defendants also introduced the affidavit of

P. H. McCarthy, president of the Building Trades Council of San Francisco, one of the defendants, from which it appears that that organization is concerned only and solely with the building industry in the city and county of San Francisco, and with the trades connected therewith, and is not connected with or concerned in any other trades union or other organization concerned with persons pursuing occupations not connected with the building industry. The constitution of the Building Trades Council is set forth in the affidavit, and its organization and relation to other organizations explained. It is denied that the Building Trades Council was ever united in or connected with or concerned in any combination, combined scheme, or conspiracy, or otherwise, with any of the labor organizations mentioned in the bill of complaint, or otherwise, or at all, to force any person, firm, or corporation (either hat manufacturers or otherwise) into an organization to be a part of the United Hatters of North America, or into any organization, or at all; denies that the Building Trades Council, either separately or in combination with any of the organizations mentioned in the bill, sought, or do they now seek, to force complainants to unionize their business; denies that the council has at any time declared a boycott against complainants; denies that they have combined and conspired with any other of the defendants of this city for the purpose of injuring complainants in their business in any way whatever, or otherwise, or at all.

The defendants contend that the allegations of the bill of complaint and the supporting affidavits are insufficient to justify the court in issuing a temporary injunction; that it does not appear that any force, threat, or intimidation has been used by the defendants to enforce the alleged boycott against the product of complainants' factory; that all that has been done by the labor organizations named in the bill has been to urge upon the friends of labor to use their patronage for the benefit of labor; that they had the constitutional right to do this, either by the publication of their views upon the subject, of by communicating them orally to their friends and to the public generally. But can it be truthfully said that this is all that has been done by the defendants and those who have acted with them in enforcing the boycott described in the bill of complaint? Are they not doing something more than speak, write, and publish their sentiments? Are they not using the power of their combined numbers, acting in concert, to drive the complainants out of business and destroy their property unless they are willing to surrender the control and management of their business to a labor organization? Are they not acting in combination, not merely for the ultimate purpose of advancing their own interests as workmen, but for the direct and immediate purpose of injuring the complainants in their business and property? If these questions must be answered in the affirmative—and upon the facts before the court they cannot be answered otherwise—then what follows? The weight of authority is that these acts are unlawful, and may be restrained by injunction.

In State v. Glidden, 55 Conn. 46, 8 Atl. 890, 3 Am. St. Rep. 23,

the case was a criminal prosecution for a conspiracy. The substance of the charge in the indictment was a conspiracy to compel the Carrington Publishing Company, against its will, to discharge its workmen, and to employ such persons as the defendants and their associates might name. In other words, the conspiracy was to deprive the publishing company of the liberty of carrying on its business in its own way, and to compel it to "unionize its shop." This object was to be accomplished by boycotting the business of the corporation, and the threatened withdrawal of patronage. In one count of the indictment it was charged "that the defendants induced one person to discontinue his subscription to said newspaper, and attempted to induce sundry other persons from advertising therein, and that the corporation was greatly damaged." Three of the defendants were found guilty. This is what the court says concerning the offense charged:

"It seems strange that in this day and this free country—a country in which law interferes so little with the liberty of the individual—that it should be necessary to announce from the bench that every man may carry on his business as he pleases; may do what he will with his own so long as he does nothing unlawful and acts with due regard to the rights of others; and that the occasion for such an announcement should be, not an attempt by government to interfere with the rights of the citizen, nor by the rich and powerful to oppress the poor, but an attempt by a large body of workingmen to control, by means little if any better than force, the action of employers."

The court states that the defendants said in effect to the publishing company:

"You shall discharge men you have in your employ, and you shall hereafter employ only such men as we shall name. It is true, we have no interest in your business; we have no capital invested therein, we are in no wise responsible for its losses or failure, we are not directly benefited by its success, and we do not participate in its profits, yet we have a right to control its management and compel you to submit to our dictation."

The court says that the bare assertion of such a right is startling; that, if such a right existed, all business enterprises would be alike subject to the dictation and control of those who might assert it, and upon the same principle, and for the same reason, the right to determine what business men shall engage in, and when and where and how it shall be carried on, will be demanded, and must be conceded to associations of workingmen of the class of those whom it would be necessary to employ. And, speaking of the fact that a combination organized for a good purpose may be perverted by the power it wields to deprive others of their just rights, the court says:

"The intention by one man, so long as he does nothing, is not a crime which the law will take cognizance of; and so, too, of any number of men acting separately. But when several men form the intent, and come together and agree to carry it into execution, the case is changed. The agreement is a step in the direction of accomplishing the purpose. The combination becomes dangerous and subversive of the rights of others, and the law wisely says it is a crime. It is no answer to say that the conspiracy was for a lawful purpose—to better their own condition, to fix and advance their rate of wages, and further their own material interest. It is certainly true that they had a right to such a purpose, and to use all lawful means to carry it into effect; and so a purpose to acquire property is lawful, so far as it contemplates

lawful means only. But if it contemplates the acquisition of money by means of murder, theft, fraud, or injustice, the end does not sanctify the means. Neither will these defendants be permitted to advance their material interests or otherwise better their condition by any such reprehensible means. They had a right to request the Carrington Publishing Company to discharge its workingmen and employ themselves, and to use all proper argument in support of their request. But they had not the right to say, 'You shall do this, or we will ruin your business.' Much less had they a right to proceed to ruin its business. In such a case the direct and primary object must be regarded as the destruction of the business. The fact that it is designed as a means to an end, and that end, in itself, considered a lawful one, does not divest the transaction of its criminality."

The court discusses other features of the case, and determines that the acts were in violation of law, and that the conviction was proper.

Crump v. Commonwealth, 84 Va. 927, 6 S. E. 620, 10 Am. St. Rep. 895, was an indictment for a conspiracy. Defendants and others, members of a typographical union, conspired to compel the proprietors of a printing office to unionize their office, and not to employ any printer who did not belong to the union. Pursuant to such conspiracy the defendants sent circulars to a large number of the customers of the printing office, informing them that they had, with the aid of other labor organizations, boycotted the printing office, and notifying the customers that the names of all who should continue to patronize the printing office after being notified of the boycott would be published in the labor paper, the organ of the union, as a black list, and they in turn would be boycotted until they agreed to withdraw their patronage from the boycotted establishment. The defendants declared it their set purpose to crush the boycotted establishment, and they used every means short of actual physical force to carry the purpose into effect. The Supreme Court of Appeals held that the acts alleged and proved in the case were unlawful and incompatible with the prosperity, peace, and civilization of the country, and if such acts could be perpetrated with impunity by combination, cabals, and cliques, there would be an end of government and of society itself. To the same effect is State v. Stewart, 59 Vt. 273, 9 Atl. 559, 59 Am. Rep. 710; State v. Donaldson, 32 N. J. Law, 151, 90 Am. Dec. 649.

In Casey v. Cincinnati Typographical Union No. 3 (in the Circuit Court of the United States for the Southern District of Ohio), 45 Fed. 135, 12 L. R. A. 193, the action was for an injunction restraining the defendants from boycotting complainant's newspaper. The defendant, Cincinnati Typographical Union, No. 3, had demanded that complainant should unionize his office (that is to say, publish and conduct his paper according to the custom, rules, and regulations laid down and prescribed by said union), and that he should pay his employés wages at such rates as should be fixed from time to time by the Union, and should discharge from his employment all persons not members thereof. The facts of this case are in some respects similar to those of the present case. Discussing these facts, the court said:

"That the défendant, the Typographical Union. set on foot a boycott against the complainant, as stated in the bill and in the affidavit on file, is not denied.

That this boycott was to be enforced by threatening loss of business to those who, having no connection with the union, should continue to advertise with or in any way patronize the complainant, is clearly shown. True, it is claimed that no threats were used, but the language of the circulars has no doubtful meaning. The affidavits on file show that it was perfectly understood by those who received them, and the circumstances indicate that it was intended that it should be so understood. In Brace v. Evans, 3 Ry. & Corp. Law J. 561, it was held that the word 'boycott' is in itself a threat. 'In popular acceptation, it is an organized effort to exclude a person from business relations with others by persuasion, intimidation, and other acts which tend to violence, and thereby coerce him, through fear of resulting injury, to submit to dictation in the management of his affairs.' But it is insisted for the defendants that every representation of fact contained in their handbills and circulars is true; that is to say, that the complainant had in 1888 broken with the typographical union, discharged all union employés, and had since that date employed only those who were not members of the union, and that, after repeatedly promising to unionize his office, he had finally, in September, 1890, refused to do so, and declared that he would not employ any person who was connected with the union. All these are conceded facts. Therefore, argue counsel for the defendants, this is only a case of lawful competition. The complainant having declared that he would not employ any member of the union, the union had a right to say that its members would not patronize the complainant. Nobody disputes that proposition. If that were all that is involved in this case, there would be nothing for the court to act upon. But it is not all by any means. Instead of 'fair, although sharp and bitter, competition,' as is contended by counsel, it was an attempt by coercion to destroy all competition affecting the union. It was an organized conspiracy to force the complainant to yield his right to select his own workmen, and submit himself to the control of the union, and allow it to regulate prices for him, and to determine whom he should employ and whom discharge. In other words, it was and is an organized effort to force printers to come into the union, or be driven from their calling for want of employment, and to make the destruction of the complainant's business the penalty for his refusing to surrender to the union."

The court reviews the authorities upon the subject, and says:

"In the light of these authorities, it is idle to talk about the defendant's acts and publications as mere incidents of a competition set on foot by complainant's declaration that he would not employ union printers, that the publications are shielded by constitutional guaranties, or that, viewed in the most unfavorable light, they are nothing more than libels, and the only remedy for any injury resulting is by an action at law."

The motion for a temporary injunction was granted.

Thomas v. Cincinnati, N. O. & T. P. Ry. Co. (C. C.) 62 Fed. 803, was a proceeding upon a petition to have one Phelan adjudged guilty of contempt of court for the violation of an injunction issued out of the Circuit Court. The proceedings involved some of the facts relating to the great railroad strike in 1894, and which was mainly supported and carried on through an organization known as the American Railway Union, by Debs, Phelan, and others, for the purpose of compelling the Pullman Palace Car Company to comply with the demands of its employés. Judge Taft, Circuit Judge, heard the petition, and in his opinion discusses the various features of the case. Speaking of the combination to prevent the operation of the railroad, he says:

"It was a boycott. The employés of the railway companies had no grievance against their employers. Handling and hauling Pullman cars did not render their services any more burdensome. They had no complaint against the use of the Pullman cars as cars. They came into no natural relation

with Pullman in handling the cars. He paid them no wages. He did not regulate their hours or in any way determine their services. Simply to injure him in his business, they were incited and encouraged to compel the railway companies to withdraw custom from him by threats of quitting their service, and actually quitting their service. This inflicted an injury on the companies that was very great, and it was unlawful, because it was without lawful excuse. All the employés had the right to quit their employment, but they had no right to combine to quit in order thereby to compel their employer to withdraw from a mutually profitable relation with a third person for the purpose of injuring that third person, when the relation thus sought to be broken had no effect whatever on the character or reward of their service. It is the motive for quitting, and the end sought thereby, that make the injury inflicted unlawful, and the combination by which it is effected an unlawful conspiracy. The distinction between an ordinary, lawful, and peaceable strike, entered upon to obtain concessions in the terms of the strikers' employment, and a boycott, is not a fanciful one, or one which needs the power of fine distinction to determine which is which. Every laboring man recognizes the one or the other as quickly as the lawyer or the judge. The combination under discussion was a boycott. It was so termed by Debs, Phelan, and all engaged in it. Boycotts, though unaccompanied by violence or intimidation, have been pronounced unlawful in every state of the United States where the question has arisen, unless it be in Minnesota; and they are held to be unlawful in England."

The respondent was adjudged guilty of contempt of court, and sentenced to prison for a term of six months.

In Arthur v. Oakes (in the United States Circuit Court of Appeals for the Seventh Circuit) 63 Fed. 310, 11 C. C. A. 209, 25 L. R. A. 414, Mr. Justice Harlan draws the distinction between the forming of a purpose by a single individual to injure another, and the combination of many persons for a like object. He says:

"It is one thing for a single individual, or for several individuals each acting upon his own responsibility and not in co-operation with others, to form the purpose of inflicting actual injury upon the property or rights of others. It is quite a different thing, in the eye of the law, for many persons to combine or conspire together with the intent not simply of asserting their rights or of accomplishing lawful ends by peaceable methods, but of employing their united energies to injure others or the public. An intent upon the part of a single person to injure the rights of others or of the public is not in itself a wrong of which the law will take cognizance, unless some injurious act be done in execution of the unlawful intent. But a combination of two or more persons with such an intent, and under circumstances that give them, when so combined, a power to do an injury they would not possess as individuals acting singly, has always been recognized as in itself wrongful and illegal."

Barr v. The Essex Trades Council, 53 N. J. Eq. 101, 30 Atl. 881, was an order to show cause why an injunction should not issue to restrain the defendants from boycotting complainant's business. The principal plaintiff was the proprietor and publisher of a daily morning newspaper called the Newark Times. He determined to use plate matter in the make-up of his paper, notwithstanding the interdictive resolution of the local typographical union, of which all his employés were at the time members. On this, some of them left his employment, others remained, and in consequence lost their membership. The union thereupon withdrew its indorsement of the paper, and reported the matter to the Trades Council, a representative association in which it and other trades unions were affiliated; the whole comprising a body of operatives in the county of

Essex of a purchasing capacity of $400,000 a week. After the publication by each side of its version of the difficulty, a circular was issued by the Trades Council calling on all friends to boycott the paper and to cease buying and advertising in it. The court held that a boycott of a newspaper started under these circumstances, in pursuance of which not only the members of the various societies were by their rules, but the public was by the circular, which was widely distributed, called on to cease buying or advertising therein, and personal application was made to actual advertisers by the distribution of printed circulars and resolutions of the societies, suggesting that they discontinue their advertising therein, even if they had made contracts to so advertise, enforced by a threat in the guise of a suggestion that if they did continue to do so they would also incur the enmity and opposition of organized labor, followed by damage to the proprietor of the paper from loss in circulation and advertising, was an actionable wrong.

My Maryland Lodge, No. 186, I. A. of M., v. Adt. (Md.) 59 Atl. 721, and Beck v. Railway Teamsters' Protective Union (Mich.) 77 N. W. 13, 42 L. R. A. 407, 74 Am. St. Rep. 421, are to the same effect; holding that a court of equity will interfere by injunction to restrain a combination of persons from boycotting complainant's business by intermeddling and coercing their customers to leave, and endeavoring by abusive and threatening language to drive away their employés.

The argument against the doctrine of the foregoing cases has been that it makes motive and combination elements of liability, contrary to the rule that an act which is not in itself actionable does not become so because the motive is malicious or bad, or because it is done in combination with two or more persons. This question was elaborately discussed in the House of Lords in Allen v. Flood, A. C. 1898, p. 1, and the rule of nonliability applied in that case. But in the later case of Quinn v. Leathem, A. C. 1901, p. 495, the question was further discussed, and upon a state of facts similar to that in the present case it was held that the acts in question were unjustifiable and illegal, in that they were not performed in the line of legitimate trade competition, for the purpose of advancing the interests of the workmen themselves, but for the sole purpose of injuring the plaintiff in his trade, and that where a combination of two or more persons, without justification or excuse, injured a man in his trade by inducing his customers or servants to break their contracts with him, or not to deal with him or continue in his employment, they were liable in damages.

In the Supreme Court of the United States, in the late case of Aikens v. Wisconsin, 195 U. S. 194, 25 Sup. Ct. 3, 49 L. Ed. 154, it was contended, as in the English cases, that no one could be held answerable in law for the exercise of a legal right on the ground that it was exercised with malevolent intent, and that the act of combining could never be considered a wrong or a crime when done in the exercise of a legal right which required for its exercise combination or co-operation. A statute of Wisconsin imposed imprisonment or fine on "any two or more persons who shall combine

\* \* \* for the purpose of willfully or maliciously injuring another in his reputation, trade, business, or profession by any means whatever." An information under this statute charged certain persons with unlawfully combining together with the intent of willfully and maliciously injuring the Journal Company, a corporation, and certain persons named, stockholders and officers of the company, in their trade and business. The agreement of the combination related to rates of advertising in the Milwaukee Journal and rival newspapers, and a feature of competition was based upon circulation. The effect of the agreement was to injure the Journal. The state court adjudged the combination unlawful. The Supreme Court of the United States sustained the judgment; holding that the liberty to combine to inflict injury upon another, even upon such intangibles as business or reputation, was not among the rights which the fourteenth amendment was intended to preserve, and that the defense that motives are not actionable is true in determining what a man is bound to foresee, but not necessarily true in determining the extent to which he can justify harm which he has foreseen. In other words, if the acts were intended and the injury foreseen, it is no defense to say that motives are not actionable. "An act," says the court, "which in itself is merely a voluntary muscular contraction, derives all its character from the consequences which will follow it under the circumstances in which it was done. When the acts consist of making a combination calculated to cause temporal damage, the power to punish such acts, when done maliciously, cannot be denied because they are to be followed and worked out by conduct which might have been lawful if not preceded by the acts. No conduct has such an absolute privilege as to justify all possible schemes of which it be a part. The most innocent and constitutionally protected of acts or omissions may be made a step in a criminal plot, and, if it is a step in a plot, neither its innocence nor the Constitution is sufficient to prevent the punishment of the plot by law." This opinion of Mr. Justice Holmes, while it was directed to the construction of a statute, appears to go to the heart of the whole question, and disposes of the argument that there can be no liability of a combination for acts unless the acts themselves are criminal.

It follows that the complainants are entitled to a temporary injunction against all the defendants except the Building Trades Council of San Francisco, which, it appears, is not concerned in any combination, scheme, or conspiracy with the other defendants to injure the complainants in their business.

### Writ of Injunction.

United States of America, Northern District of California—ss.:

The President of the United States of America, to California State Federation of Labor, San Francisco Labor Council, Harry Knox, T. F. Gallagher, Nicholas Blum, Daniel D. Sullivan, J. R. Hillis, C. W. Holmquist, J. C. Templeton, John Guinne, Frank J. Bonnington, G. K. Smith, Will J. French, A. C. Rose, Russel I. Wisler, P. H. Coyle, J. A. Johnson, Richard Cornelius, Sarah Hogan, Charles T. Shuppert, J. L. Franklin, Theodore Johnson, G. M. Lipman, Wm. P. McCabe, George Metzger, A. Burton, J. E. Hooper, A. S. Howe, Joseph

Moran, Annie Mullen, O. E. Pierce, T. E. Zant, J. R. Roland, their, and each of their, attorneys, agents, employés, and all persons acting in aid of, or in conjunction with them, or any of them, greeting:

Whereas, Dietrich E. Loewe and Martin Fuchs, complainants in the above-entitled cause, and citizens of the state of Connecticut, have filed on the chancery side of the Circuit Court of the United States for the Northern District of California a bill against the above-named defendants and others, and have obtained an allowance for an injunction as prayed for in said bill:

Now, therefore, we, having regard to the matters in said bill contained, do hereby command and strictly enjoin you, the said California State Federation of Labor, San Francisco Labor Council, Harry Knox, T. F. Gallagher, Nicholas Blum, Daniel D. Sullivan, J. R. Hillis, C. W. Holmquist, J. C. Templeton, John Guinne, Frank J. Bonnington, G. K. Smith, Will J. French, A. C. Rose, Russel I. Wisler, P. H. Coyle, J. A. Johnson, Richard Cornelius, Sarah Hogan, Charles T. Shuppert, J. L. Franklin, Theodore Johnson, G. M. Lipman, Wm. P. McCabe, George Metzger, A. Burton, J. E. Hooper, A. S. Howe, Joseph Moran, Annie Mullen, O. E. Pierce, T. E. Zant, J. R. Roland, your, and each of your, attorneys, agents, employés, and all persons acting in aid of or in conjunction with you, or any of you, from in any manner agreeing or combining or conspiring together to injure or destroy the trade or business of complainants herein, or to interfere with the manufacture, transportation, or sale by complainants, or by any other person, firm, or corporation, of hats manufactured by complainants; from boycotting or agreeing or attempting to boycott and from declaring or continuing a boycott against complainants or complainants' trade or business or the product of complainants' said factory, or against any person, firm, or corporation, for the purpose of preventing or injuring, and from thereby preventing or injuring, the regular operation and conduct of complainants' trade or business or the transportation or sale of or trade in hats manufactured or sold by said complainants, and from abetting, aiding, or assisting in such boycott; from publishing or circulating, in combination, or in pursuance of any conspiracy or agreement to injure or destroy the trade or business of complainants, in writing or orally, any statements or representations advertising or calling the attention of complainants' customers or merchants or tradesmen or the public to any boycott or strike against complainants, or against the product of complainants' said factory, or that, or to the effect that, complainants, complainants' factory, or complainants' goods, or the hats or products made or sold by complainants, or sold by complainants' customers, are or were "unfair," or should not be purchased or dealt in or handled by the public or merchants or tradesmen; from publishing or circulating, in combination, or in pursuance of any conspiracy or agreement to injure or destroy the trade or business of complainants, or for the purpose of injuring or destroying the trade or business of complainants, in writing or orally, statements or representations to customers of complainants, or to dealers in hats, or tradesmen or the public, that complainants' factory, complainants' business, or complainants' hats, or the product of complainants' factory, or either or any of them, are unfair or have been boycotted or are boycotted, or should not be dealt in or with or sold, and from coercing or inducing or attempting to coerce or induce any such dealer, person, firm, or corporation, or the public, not to wear, buy, trade in, deal in, or have in possession, hats or any hat made by complainants, or the product of complainants' factory, for the purposes last aforesaid, and, for like purposes, from threatening any person, firm, or corporation with injury or loss to the business or trade of such person, firm, or corporation in case such person, firm, or corporation should purchase or deal in hats manufactured by complainants, or the product of complainants' said factory; from giving any orders or directions to committees, associations, or others for the performance of any acts or threats hereinbefore enjoined—which commands and injunctions you are respectively required to observe and obey until our said Circuit Court shall make further order in the premises.

Hereof fail not, under penalty of the law thence ensuing.

Witness the Honorable Melville W. Fuller, Chief Justice of the United States, this 1st day of July, 1905, and in the 129th year of the Independence of the United States of America.