IRON MOLDERS' UNION NO. 125 OF MILWAUKEE, WIS., et al. v. ALLIS-CHALMERS CO.

(Circuit Court of Appeals, Seventh Circuit. October 9, 1908.)

No. 1,434.

1. APPEAL AND ERROR (§ 174*)—NECESSITY OF OBJECTION IN LOWER COURT—DEFENDANTS—CAPACITY TO BE SUED.

The objection made on behalf of a labor union joined as a defendant in a suit for an injunction as representing its members collectively, that it was an unincorporated voluntary association not authorized to be sued by the laws of the state, will not be heard on appeal unless first presented in the trial court.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 1122; Dec. Dig. § 174.*]

2. CONSPIRACY (§ 8*)—ACTS CONSTITUTING COMBINATION TO INJURE—STRIKES.

A strike by workmen in good faith to enforce demands respecting wages, overtime, and other conditions of employment in a trade, made by the concerted action of the local unions in such trade against all employers alike, is not a combination for the purpose of willfully and maliciously injuring an employer, made unlawful by St. Wis. 1898, § 4466a, but is a combination for a lawful purpose, and the right of an employer to an injunction against

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the strikers depends entirely upon the lawfulness of the means employed by them to accomplish such purpose.

[Ed. Note.—For other cases, see Conspiracy, Cent. Dig. §§ 7–11; Dec. Dig. § 8.*

Restraining boycotts, strikes and other combinations by employés interfering with commerce or business, see note to Shine v. Fox Bros. Mfg. Co., 86 C. C. A. 313.]

**3.** INJUNCTION (§ 189*)—STRIKES—SCOPE OF RELIEF.

Strikers who seek a legitimate end may not be enjoined from pursuing that end in a legitimate way merely because they may have overstepped the line and trespassed on the rights of their adversary, but a decree fixing a barrier at such line and subjecting them to punishment and damages for having crossed it is as far as the court may go.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. § 409; Dec. Dig. § 189.*]

**4.** INJUNCTION (§ 63*) — STRIKES — INTERFERENCE WITH CONTRACTS OF APPRENTICES.

It is unlawful for striking workmen by any means to induce apprentices, under contract to serve the employer for definite terms, to break such contracts, and such action may properly be enjoined.

[Ed. Note.—For other cases, see Injunction, Dec. Dig. § 63.*]

**5.** TORTS (§ 10*)—GROUNDS OF RELIEF—STRIKES—PERSUASION OF OTHER WORKMEN.

The right of an employer during a strike of his workmen to persuade, but not coerce, unemployed workmen to accept his employment and terms, is limited and conditioned by the right of the strikers to dissuade, but not restrain, them from so accepting.

[Ed. Note.—For other cases, see Torts, Cent. Dig. § 10; Dec. Dig. § 10.*]

**6.** TORTS (§ 10*)—STRIKES—SECONDARY BOYCOTT.

Striking workmen may not coerce third persons, not directly concerned in the strike, into refusing to buy or use the products of their late employer, any more than he may lawfully coerce third persons into refusing them shelter or food, but the only means of injuring each other which are lawful in such a contest are those that operate directly and immediately upon the control and supply of work to be done and of labor to do it.

[Ed. Note.—For other cases, see Torts, Cent. Dig. § 10; Dec. Dig. § 10.*]

**7.** INJUNCTION (§ 189*)—STRIKES—SCOPE OF INJUNCTION.

An injunction against strikers should not prohibit either persuasion or picketing as such, as when carried beyond their legitimate limits they become duress or intimidation, and as such may be enjoined.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. § 409; Dec. Dig. § 189.*]

**8.** CONSPIRACY (§ 8*)—GROUNDS OF RELIEF—STRIKES.

A manufacturing company whose skilled workmen are on a strike has the right to seek the aid of other manufacturers to make or complete its products, and the strikers have the reciprocal right to seek the aid of their fellow workmen in the employ of such other manufacturers to prevent that end, and may lawfully combine and co-operate for that purpose.

[Ed. Note.—For other cases, see Conspiracy, Cent. Dig. §§ 7–11; Dec. Dig. § 8.*]

**9.** INJUNCTION (§ 189*)—GROUNDS AND SCOPE OF RELIEF—STRIKES.

A decree awarding a permanent injunction against striking workmen considered and modified.

[Ed. Note.—For other cases, see Injunction, Dec. Dig. § 189.*]

Appeal from the Circuit Court of the United States for the Eastern District of Wisconsin.

For opinion below, see 150 Fed. 155.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

The appeal is from a final decree in a strike injunction suit.

On the bill, supplemental bill, and showing in connection therewith, a temporary injunction was issued. Later, certain of the individual defendants were found to have violated the temporary injunction, and were accordingly punished. The pleadings, the temporary injunction, and the petition and evidence in the contempt proceedings are all stated in Allis-Chalmers Co. v. Iron Molders' Union (C. C.) 150 Fed. 155.

By agreement of parties the cause was submitted for final hearing upon the "proofs taken on the motion to commit for contempt, as well as upon the other proofs in the case."

The final decree enjoins the defendants, four Wisconsin local unions of the national organization of iron molders and some sixty individuals who were officers and members, from doing the following:

"(1) From in any manner directly interfering with, hindering, obstructing, or stopping the business of the said complainant, or its agents, servants or employés, in the maintenance, conduct, management or operation of its business.

"(2) From compelling or inducing or attempting to compel or induce by threats, intimidation, force or violence any of the said company's employés to fail or refuse to work for it, or to leave its service.

"(3) From preventing or attempting to prevent any person or persons by threats, intimidation, force or violence, from freely entering into or continuing in the said company's service.

"(4) And from congregating upon or about the company's premises or the streets, approaches and places adjacent or leading to said premises for the purpose of intimidating its employés or preventing or hindering them from fulfilling their duties as such employés or for the purpose of in such manner as to induce or coerce by threats, violence, intimidation or persuasion, any of the said company's employés to leave its service or any person to refuse to enter its service.

"(5) From congregating upon or about the company's premises or the sidewalk, streets, alleys or approaches adjoining or adjacent to or leading to said premises, and from picketing the said complainant's places of business or the homes or boarding houses or residences of the said complainant's employés.

"(6) From interfering with the said company's employés in going to and from their work.

"(7) From going singly or collectively to the homes of the said company's employés for the purpose of intimidating or threatening them or collectively persuading them to leave its service.

"(8) From enforcing, maintaining or aiding any illegal boycott against the said company, its agents or employés.

"(9) From endeavoring to illegally induce people not to deal with said company, its agents and employés.

"(10) From preventing or attempting to prevent by threats, intimidation, persuasion or in any other manner any person or corporation from performing work for said complainant and from doing business with it.

"(11) From intimidating or threatening in any manner the wives and families of said employés at their homes or elsewhere.

"(12) From doing any of the aforesaid or any other acts for the purpose of compelling and inducing or attempting to compel or induce the complainant by threats, intimidation, force or violence, against its will or the will of its officers, to employ or to discharge any person or persons whomsoever, and especially to employ members of said unions or discharge persons who are not members of said unions.

"(13) From combining, associating, agreeing, mutually undertaking, concerting together or with other persons for the purpose of doing or causing to be done any of the aforesaid prohibited acts.

"(14) From combining, associating, agreeing, mutually undertaking, concerting together or with other persons for the purpose of preventing [or hindering the complainant from doing or performing] any lawful act in the conduct of its aforesaid business or for the purpose of injuring the complainant in its aforesaid business, or of compelling the complainant against its will from doing or performing any lawful act or from injuring the said complainant in its trade and business.

"(15) From directing and abetting or counselling any acts whatsoever or in any manner whatsoever the conspiracy and combination found by the court to exist, to prevent the complainant and its officers and employés in the free and uninterrupted control and direction of its business and affairs and to prevent the complainant from doing or performing any and all lawful acts in the conduct of its business and to compel the complainant against its will from doing and performing its lawful business and to prevent the complainant from doing or performing all lawful acts in the conduct or management of its business.

"(16) From by threats, intimidation, persuasion, force or violence, compelling or attempting to compel or induce any of the apprentices in the employ of the said complainant to break their contracts and leave the employ of the said complainant."

Under various assignments of error appellants contend that the unions were improperly included in the final decree because they were voluntary unincorporated associations; that the decree as a whole should be reversed for the reason that it is not supported by the evidence; that the parts of the decree are wrong which deny appellants the use of persuasion and the use of pickets; and that the finding of a boycott is contrary to the evidence.

The further facts are stated in the opinion.

Frederick H. Judson and W. B. Rubin, for appellants.

Wm. J. Turner and James M. Beck, for appellee.

Before GROSSCUP, BAKER, and SEAMAN, Circuit Judges.

BAKER, Circuit Judge (after stating the facts as above). No Wisconsin statute authorized an unincorporated voluntary association to be sued in its common name. So the objection might have prevailed if it had been seasonably made. Karges Furniture Co. v. Amalgamated Wood Workers' Union, 165 Ind. 421, 75 N. E. 877, 2 L. R. A. (N. S.) 788; Pickett v. Walsh, 192 Mass. 572, 78 N. E. 753, 6 L. R. A. (N. S.) 1067, 116 Am. St. Rep. 272. But the members could have been reached, of course, either by naming and serving them all, or, if that were impracticable on account of their numbers, by suing some as representatives of all. The bill treated the unions as representative of their membership; an individual member filed a verified answer in the names of the unions, alleging that he had been authorized by them so to do; and the case was carried through three hearings (temporary injunction, contempt, final decree) without a suggestion that there was a defect of parties, or rather a defect in the form under which appellee asked to have the membership of the unions brought into court. An objection of this kind will not be entertained on appeal unless it has been first duly presented in the trial court. Barnes v. Chicago Typographical Union, 232 Ill. 424, 83 N. E. 940, 14 L. R. A. (N. S.) 1018.

The evidence showed that appellee was entitled to injunctive relief. To keep other workmen out of appellee's foundries, some of the union men went to the extent of using vile and abusive language, threats of violence, and actual assaults. This was effective enough to damage appellee's business quite seriously, and was carried on under circumstances that might be held to indicate the unions' tacit approval. None of the appellants ever challenged by appeal the justice of the temporary injunction or of the punishments for its violation. And on this appeal from the final decree not a shadow of justification is found for these acts of violence and intimidation. The only substantial question is

whether or not the trial court has stepped beyond the line of safeguarding the legal rights of appellee and has thereby deprived appellants of some of their legal rights.

To organize for the purpose of securing improvement in the terms and conditions of labor, and to quit work and to threaten to quit work as means of compelling or attempting to compel employers to accede to their demands for better terms and conditions, are rights of workmen so well and so thoroughly established in the law (Thomas v. Rld. Co. [C. C.] 62 Fed. 803; Arthur v. Oakes, 63 Fed. 320, 11 C. C. A 209, 25 L. R. A. 414; Wabash Rld. Co. v. Hannahan [C. C.] 121 Fed. 563), that nothing remains except to determine in successive cases as they arise whether the means used in the endeavor to make the strike effective are lawful or unlawful.

By section 4466a, St. Wis. 1898, and, appellee asserts, by the common law as well, it is illegal for two or more persons to combine for the purpose of "doing a harm malevolently for the sake of the harm as an end in itself, and not merely as a means to some further end legitimately desired." Aikens v. Wisconsin, 195 U. S. 194, 25 Sup. Ct. 3, 49 L. Ed. 154. As the combination among appellants was entered into and carried on in Wisconsin, a threshold inquiry is whether the present is a malicious mischief case under this paragraph, wherein otherwise innocent means are condemned because the end is wicked, or a true strike case under the preceding paragraph, wherein, because the end is lawful, all means may be called into play except those that are unlawful in themselves.

The record shows that the local unions had a conference in regard to conditions in all the foundries in the city and county of Milwaukee; that they formulated demands respecting wages, overtime, double time on holidays, piecework, weekly pay day, limitation of the number of apprentices, and a joint arbitration board; that these demands were made alike upon all the foundry owners within that territory; and that when the demands were rejected the union men in all the foundries struck. Nothing in the record indicates that there was any want of good faith in making these demands, or that the strike was undertaken with any other purpose than to enforce them, or that appellee received or was singled out to receive different treatment from that dealt out to other foundry owners. So the employment of assault and duress in the progress of the strike should be attributed to a combination to accomplish a lawful end by unlawful means, rather than the employment of unlawful means should be taken as proof that the end sought to be accomplished by such means was itself unlawful. And consequently the parts of the decree which prohibit the use of persuasion and picketing can be justified only on the basis that such means are not lawfully to be applied in a genuine struggle of labor to obtain better terms and conditions; for surely men are not to be denied the right to pursue a legitimate end in a legitimate way, simply because they may have overstepped the mark and trespassed upon the rights of their adversary. A barrier at the line, with punishment and damages for having crossed, is all that the adversary is entitled to ask.

So far as persuasion was used to induce apprentices or others (sec-

166 F.—4

tion 16 of the decree) to break their contracts to serve for definite times, the prohibition was right. And the reason, we believe, is quite plain. Each party to such a contract has a property interest in it. If either breaks it, he does a wrong, for which the other is entitled to a remedy. And whoever knowingly makes himself a party to a wrongful and injurious act becomes equally liable. But in the present case the generality of the men who took or sought the places left by the strikers were employed or were offered employment at will, as the strikers had been. If either party, with or without cause, ends an employment at will, the other has no legal ground of complaint. So if the course of the new men who quit or who declined employment was the result of the free play of their intellects and wills, then against them appellee had no cause of action, and much less against men who merely furnished information and arguments to aid them in forming their judgments. Now it must not be forgotten that the suit was to protect appellee's property rights. Regarding employments at will, those rights reached their limit at this line: For the maintenance of the incorporeal value of a going business appellee had the right to a free access to the labor market, and the further right to the continuing services of those who accepted employment at will until such services were terminated by the free act of one or the other party to the employment. On the other side of this limiting line, appellants, we think, had the right, for the purpose of maintaining or increasing the incorporeal value of their capacity to labor, to an equally free access to the labor market. The right of the one to persuade (but not coerce) the unemployed to accept certain terms is limited and conditioned by the right of the other to dissuade (but not restrain) them from accepting. For another thing that must not be forgotten is that a strike is one manifestation of the competition, the struggle for survival or place, that is inevitable in individualistic society. Dividends and wages must both come from the joint product of capital and labor. And in the struggle wherein each is seeking to hold or enlarge his ground, we believe it is fundamental that one and the same set of rules should govern the action of both contestants. For instance, employers may lock out (or threaten to lock out) employees at will, with the idea that idleness will force them to accept lower wages or more onerous conditions; and employees at will may strike (or threaten to strike), with the idea that idleness of the capital involved will force employers to grant better terms. These rights (or legitimate means of contest) are mutual and are fairly balanced against each other. Again, an employer of molders, having locked out his men, in order to effectuate the purpose of his lockout, may persuade (but not coerce) other foundrymen not to employ molders for higher wages or on better terms than those for which he made his stand, and not to take in his late employees at all, so that they may be forced back to his foundry at his own terms; and molders, having struck, in order to make their strike effective may persuade (but not coerce) other molders not to work for less wages or under worse conditions than those for which they struck, and not to work for their late employer at all, so that he may be forced to take them back into his foundry at their own terms. Here, also, the rights are

mutual and fairly balanced. On the other hand, an employer, having locked out his men, will not be permitted, though it would reduce their fighting strength, to coerce their landlords and grocers into cutting off shelter and food; and employees, having struck, will not be permitted, though it might subdue their late employer, to coerce dealers and users into starving his business. The restraints, likewise, apply to both combatants and are fairly balanced. These illustrations, we believe, mark out the line that must be observed by both. In contests between capital and labor the only means of injuring each other that are lawful are those that operate directly and immediately upon the control and supply of work to be done and of labor to do it, and thus directly affect the apportionment of the common fund, for only at this point exists the competition, the evils of which organized society will endure rather than suppress the freedom and initiative of the individual. But attempts to injure each other by coercing members of society who are not directly concerned in the pending controversy to make raids in the rear cannot be tolerated by organized society, for the direct, the primary, attack is upon society itself. And for the enforcement of these mutual rights and restraints organized society offers to both parties, equally, all the instrumentalities of law and of equity.

With respect to picketing as well as persuasion, we think the decree went beyond the line. The right to persuade new men to quit or decline employment is of little worth unless the strikers may ascertain who are the men that their late employer has persuaded or is attempting to persuade to accept employment. Under the name of persuasion, duress may be used; but it is duress, not persuasion, that should be restrained and punished. In the guise of picketing, strikers may obstruct and annoy the new men, and by insult and menacing attitude intimidate them as effectually as by physical assault. But from the evidence it can always be determined whether the efforts of the pickets are limited to getting into communication with the new men for the purpose of presenting arguments and appeals to their free judgments. Prohibitions of persuasion and picketing, as such, should not be included in the decree. Karges Furniture Co. v. Amalgamated Wood Workers' Union, 165 Ind. 421, 75 N. E. 877, 2 L. R. A. (N. S.) 788; Everett-Waddy Co. v. Typographical Union, 105 Va. 188, 53 S. E. 273, 5 L. R. A. (N. S.) 792.

We have not found anything in the evidence that justified the decree as to an "illegal boycott." No attempt was made to touch appellee's dealings or relations with customers and users of its goods. Oxley Stave Co. v. Coopers' International Union (C. C.) 72 Fed. 695; Loewe v. Cal. State Federation of Labor (C. C.) 139 Fed. 71; Loewe v. Lawlor, 208 U. S. 274, 28 Sup. Ct. 301, 52 L. Ed. 488. After the strike was on, appellee sent patterns, on which the strikers had been working, to foundries in other cities. The strikers procured the molders in those foundries, who also were members of the Iron Molders' Union of North America, to refuse to make appellee's castings. Those molders notified their employers that they would have to cancel their contracts to make castings for appellee, or they would quit work. Some employers discharged the notifiers, others refused to cancel and

the union men struck, and others complied and the union men stayed. In those instances where the foundrymen fulfilled their contracts, appellee was not damaged; in those where foundrymen broke their contracts, there is no proof that appellee has not collected or cannot collect adequate damages. That might be taken as a reason why appellee on this branch of the case is not entitled to the aid of equity. But there is a more important reason. Appellants were aiming to prevent, and appellee to secure, the doing of certain work in which the skill of appellants' trade was necessary. Here was the ground of controversy, and here the test of endurance. If appellee had the right (and we think the right was perfect) to seek the aid of fellow foundrymen to the end that the necessary element of labor should enter into appellee's product, appellant had the reciprocal right of seeking the aid of fellow molders to prevent that end. To whatever extent employers may lawfully combine and co-operate to control the supply and the conditions of work to be done, to the same extent should be recognized the right of workmen to combine and co-operate to control the supply and the conditions of the labor that is necessary to the doing of the work. In the fullest recognition of the equality and mutuality of their rights and their restrictions lies the peace of capital and labor, for so they, like nations with equally well drilled and equipped armies and navies, will make and keep treaties of peace, in the fear of the cost and consequences of war.

The decree is modified by striking out "persuasion" and "persuading" from the 4th and 7th paragraphs; further modified by adding after "picketing" in the 5th paragraph "in a threatening or intimidating manner"; vacated as to the 1st, 8th, 9th, 10th, 14th and 15th paragraphs; affirmed as to the 2nd, 3rd, 6th, 11th, 12th, 13th, 16th and the modified 4th, 5th and 7th paragraphs. Costs of this court to be divided equally.

GROSSCUP, Circuit Judge (concurring). The foregoing opinion so compactly and clearly sets forth the correlative rights and the correlative obligations of employer and employees when engaged in a strike or lock out, that it is with hesitation that I add this word; and I only add it that nothing that is contained in the opinion, may be construed to relate to the correlative rights and the correlative obligations of employer and employees in any relationship other than their somewhat anomalous relationship pending a strike or lock out.

A strike is cessation of work by employees in an effort to get for the employees more desirable terms. A lock out is a cessation of the furnishing of work to employees in an effort to get for the employer more desirable terms. Neither strike nor lock out completely terminates, when this is its purpose, the relationship between the parties. The employees who remain to take part in the strike or weather the lock out do so that they may be ready to go to work again on terms to which they shall agree—the employer remaining ready to take them back on terms to which he shall agree. Manifestly, then, pending a strike or a lock out, and as to those who have not finally and in good faith abandoned it, a relationship exists between employer

and employee that is neither that of the general relation of employer and employee, nor again that of employer looking among strangers for employees, or employees seeking from strangers employment. And it is with respect to this somewhat anomalous relationship that, as I understand it, this opinion speaks; a statement that it seems to me ought to be made to confine the opinion to the actual situation to which it is intended to relate—to differentiate what we say from what might arise in cases where, neither strike nor lock out pending, persuasion is resorted to to induce other employers not to employ given applicants for employment, or to persuade employees not to take employment with given employers, upon which questions we do not as I understand it, express any opinion.