## Philip Henrici Company, Appellant, v. Carrie Alexander et al., Appellees.

### Gen. No. 20,934.

1. CONSPIRACY, § 14*—*when evidence insufficient to show illegal boycotting.* On a bill to enjoin defendants from unlawfully conspiring to boycott complainant's business, evidence examined and *held* not to show an illegal act on defendant's part.

2. CONSPIRACY, § 8*—*when distribution of printed matter not illegal.* On a bill to enjoin defendants from printing or publishing any printed matter calling attention to the fact that complainant's business is unfair and not unionized or that a strike is on, *held* that the distribution of a publication purporting to give information regarding the strike and of printed matter stating that complainant was unfair was not illegal.

3. CONSPIRACY, § 14*—*when evidence insufficient to show conspiracy beyond reasonable doubt.* On a bill and cross-bill, each alleging a conspiracy to injure business, evidence examined and *held* insufficient to establish a conspiracy beyond a reasonable doubt, as required by law.

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

4. CONSPIRACY, § 8*—*when picketing illegal.* Where the facts show that there was no strike, and the pickets made statements not warranted by the facts, and by reason of the picketing crowds congregated which interfered with complainant's business, the picketing was properly enjoined.

5. CONSPIRACY, § 14*—*when evidence sufficient to show picketing.* On a bill to enjoin defendants from interfering with complainant's business, evidence that defendants patrolled in front of complainant's restaurant, in which there was no strike, stating to each other so that they could be heard by passers-by that there was a strike on at such place; "We want $8 for six days' work"; "Don't eat under police protection," and words of similar import, is sufficient to show picketing tending unlawfully to interfere with complainant's business against which an injunction would be granted.

6. CONSPIRACY, § 16*—*when decree enjoining picketing and patrolling modified.* On a bill to enjoin picketing and patrolling complainant's place of business, where the evidence shows the picketing was not justified, the decree enjoining such picketing and patrolling should not be qualified by adding thereto the words "in such a manner as to intimidate, threaten or coerce any person or persons from entering or who may desire to enter said premises for the purpose of patronizing the complainant, or for any lawful purpose whatsoever," and on appeal the decree will be modified by striking the qualification therefrom.

GOODWIN, J., dissenting in part.

Appeal from the Circuit Court of Cook county; the Hon. JOHN P. McGOORTY, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1914. Decree modified and affirmed. Opinion filed April 12, 1916.

McEWEN, WEISENBACH, SHRIMSKI & MELOAN, for appellant.

EDGAR L. MASTERS, for appellees.

MR. JUSTICE O'CONNOR delivered the opinion of the court.

Appellant filed a bill for injunction in the Circuit Court of Cook county against the appellees, and after

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

answer filed, appellees filed a cross-bill praying for an injunction against the appellant and other parties. The cause came on for hearing before the Honorable John P. McGoorty, who associated with himself the Honorable Jesse A. Baldwin and the Honorable Thomas G. Windes, judges of said court. From a decree dismissing the cross-bill for want of equity and awarding an injunction in favor of appellant for less than the relief prayed, both parties were allowed an appeal. Appellant has perfected its appeal in this court, and appellees have assigned cross-errors. For convenience, the parties will hereafter be designated as complainant and defendants as in the court below.

Complainant is a corporation engaged in the restaurant and bakery business in the City of Chicago, and has conducted said business for a number of years. The business is successful and profitable. At the time of the filing of the bill it served more than 2,000 patrons daily in its restaurant, some of whom had been customers continuously for a number of years. Complainant employed about 125 persons in various capacities, including 54 waitresses, 7 cooks and 10 bakers. Many of them had been in its employ for years. The waitresses received wages ranging from $3.50 to $7 per week, depending on the number of hours worked which varied from 18 to 57. In addition to their wages the girls received their meals. The evidence also tended to show that as a result of gratuities or "tips," given to the waitresses by the patrons, the amount received, including their wages, aggregated from $15 to $25 per week.

About six months prior to the filing of the bill, the Waitresses' Union, Local No. 484, co-operating with the Chicago Cooks' and Pastry Cooks' Union, Local No. 865, and the Bakers' and Confectioners' Union, Local No. 2, began a campaign in Chicago to unionize the restaurants of the city. The primary purpose of the unions was the improvement of the working condi-

tions of the waitresses, including a minimum wage of $8 per week, consisting of a maximum of 60 hours, and one day of each week for rest and recreation.  As a result of such campaign more than 100 restaurants, principally in the loop district of the city, signed the union agreement which embodied the working conditions above mentioned, and provided for a closed shop. In pursuance of the campaign representatives of the three unions called upon the complainant and requested it to sign a similar trade agreement.  Complainant informed them that many of its waitresses had been in its employ for a number of years; that they were satisfied with their working conditions, and at no time had they made any complaint; that it would interpose no objection to the waitresses joining the union, and further time was asked by the complainant to consider the agreement submitted.  At a subsequent meeting complainant informed the union representatives that it had become a member of the Restaurant Keepers' Association of Chicago, which consisted of about 40 members, and that further negotiations with reference to the agreement must be taken up with said Association.  This was in accordance with a provision of the Constitution of said Association, which is as follows:

"Any member who shall settle a strike or demand of any labor organization whatever affecting the general welfare of the members of this Association shall be suspended and not reinstated until he shall have complied with the conditions which this Association may impose."

Further negotiations were had between the Association and defendants in this regard.  Complainant refused to sign the agreement, and pursuant to a resolution passed by the three unions, a strike was called at the restaurant of complainant, February 5, 1914.  On the same day 4 of the 10 bakers, members of the union, quit work; also 2 of the 7 cooks, whose reason for leav-

ing is in dispute. All of the waitresses, however, continued with their work as before, none of them being members of the union. The evidence for the complainant tends to show that it made no discrimination in the hiring of its employees in favor of or against union labor, while evidence on behalf of the defendants tended to show that waitresses belonging to the union had been discharged by the complainant because they were members of the union.

On February 5, 1914, from 6 to 10 members of the waitresses' union, in accordance with instructions from the union, patrolled in front of complainant's restaurant, walking back and forth from a point about 25 feet east to a point about the same distance west of the restaurant, and saying to each other so that they could be heard by the passers-by: "There is a strike on at Henrici's." "We want $8 for six days work." "Don't eat under police protection," and words of similar import. On one occasion one of the pickets wore a mackintosh on which was printed the following words: "We want $8 for six days work." Match boxes on which it was stated that the complainant was "unfair" were sent out from the waitresses' union, together with a publication known as the Bakers' Journal which purported to give information regarding the strike, and were distributed to the public. The pickets were supplemented at times by one to three members of the bakers' and cooks' unions. The patrolling was done principally at the lunch and supper hours. The pickets were instructed by the union to obey the law and continue moving; that they were not to accost any one nor allow any one to accost or speak to them; that the picketing must be peaceful, and that they should give general information to the public in regard to their grievances to gain its moral support.

Complainant's restaurant is located at Nos. 67 to 71 West Randolph street, Chicago, in what is known as the loop district. The picketing attracted large crowds

to the vicinity and in front of the restaurant. Crowds also congregated on the opposite side of the street and at times interfered with the business conducted on the street in the vicinity of the restaurant. The picketing continued until March 6th, and the evidence tends to show that during the picketing the number of customers per day at the restaurant was about 250 less than normal. Pickets were arrested daily, the number of arrests aggregating 119. One of them was arrested 15 times, and three of them complained of brutality on the part of the police. They were charged with criminal conspiracy, disorderly conduct, obstructing the sidewalk, etc. It is admitted that none of the pickets committed any act of violence.

The bill contains the usual allegations, and prays that the defendants be enjoined from unlawfully conspiring to boycott or interfere with complainant's business; from interfering with its employees by intimidation, insults or threats; from printing or publishing any printed matter calling attention to the fact that complainant's business is unfair and not unionized or that a strike is on; from patrolling in front of or adjacent to the restaurant, etc. The cross-bill makes the complainant, the chief of police, John Vogelsang, Chicago Restaurant Keepers' Association, and unknown police officers, parties defendant. It charges the cross-defendants with entering into a conspiracy to injure the waitresses' union and certain unions cooperating in the strike, thus making the same charge against the complainant as is made against the defendants. It alleges that the cross-complainants have not entered into any controversy for the purpose of injuring complainant's business, but that they are acting in the strike for the purpose of strengthening their organization, in order that the members thereof may profit by better economic conditions, higher wages, less hours of service, and better conditions. The prayer

was that the cross-defendants be enjoined from continuing the conspiracy, and from doing any act to injure the unions.

After a full hearing a decree was entered dismissing the cross-bill for want of equity and providing: "That the defendants to the original bill and each of them and their attorneys, solicitors, agents, servants and associates and each and every of them be enjoined and restrained from unlawfully hindering, obstructing or interfering with the business of the Complainant, Philip Henrici Company, or its employees, by any act of violence or intimidation or by picketing or patrolling the street in front of or in the alley in the rear of Complainant's place of business at 67 to 71 West Randolph street, in the City of Chicago, Cook County, Illinois in such a manner as to intimidate, threaten or coerce any person or persons from entering or who may desire to enter said premises for the purpose of patronizing the Complainant, or for any lawful purpose whatsoever."

Both parties are dissatisfied with the decree. The complainant contends that the court should have entered a decree in accordance with the prayer of the bill; that the evidence clearly established that the defendants were guilty of a conspiracy to injure the business of complainant, and that they were guilty of boycotting complainant's business. The defendants contend that the evidence established that the cross-defendants are guilty of a conspiracy to injure the defendants' union.

The court held, after a careful review of the authorities, that neither party had proven the charge of conspiracy beyond a reasonable doubt as required by law; that the so-called boycotting was not illegal, and that the distribution of the publication by the defendants, to which objection is made, should not be enjoined. In this conclusion we concur.

The principal controversy, however, in this case, is as to the right of the defendants to picket complainant's place of business in the manner shown by the evidence. The complainant contends that, under the law of this State, there is no such thing as peaceful picketing, and that under the law and facts in this case, the picketing should be enjoined without qualification. In support of its contention numerous cases are cited. Reliance, however, is placed chiefly on the case of *A. R. Barnes & Co. v. Chicago Typographical Union,* 232 Ill. 424. On the other hand, the defendants contend that peaceful picketing is not unlawful; that no act of violence was committed by any of the pickets (this is conceded by the complainant), and that therefore the bill should be dismissed for want of equity. In support of their contention, the defendants cite the cases of *Kemp v. Division No. 241,* 255 Ill. 213; and *Iron Molders' Union v. Allis-Chalmers Co.,* 166 Fed. 45.

In the *Barnes* case, *supra,* a decree was entered enjoining the defendants, among other things, "from picketing or maintaining at or near the premises of said complainants, or any of them, any picket or pickets." In that case the complainants were engaged in the printing business. On account of some dispute over the hours of labor, etc., a strike was called and complainant's place of business was picketed. The pickets were guilty of threats and actual intimidation. In passing on the question of picketing, the majority of the court, speaking by Mr. Justice Cartwright, say (p. 435) : "It is next contended that if any injunction was authorized, the injunction granted was too broad in enjoining appellants from peaceful picketing of complainants' premises and from congregating about or near their places of business for the purpose of inducing or soliciting employees to leave the employment. It is contended that a peaceful picket line around a shop is entirely lawful. But this court has held otherwise in *Franklin Union v. People, supra* (220 Ill. 355),

where endorsement was given to the doctrine of *Beck v. Railway Teamsters' Protective Union,* 118 Mich. 497, by quoting therefrom, as follows: 'To picket complainants' premises in order to intercept their teamsters or persons going there to trade is unlawful. It, itself, is an act of intimidation and an unwarrantable interference with the right of free trade. The highways and public streets must be free to all for the purposes of trade, commerce and labor. The law protects the buyer, the seller, the merchant, the manufacturer and the laborer in the right to walk the streets unmolested. It is no respecter of persons, and it makes no difference, in effect, whether the picketing is done ten or ten hundred feet away.' The court also gave its approval to the decision in *Vegelahn v. Guntner,* 167 Mass. 92. In that case a patrol of two men in front of the plaintiff's factory, maintained as one of the means of carrying out the defendants' plan, was held to be an unlawful interference with the rights of the employer and the employed. The patrolling or picketing of the premises was considered to have elements of intimidation, and the court decided that the motive of obtaining better wages for themselves on the part of the defendants did not justify maintaining a patrol in front of the complainant's premises as a means of carrying out their conspiracy. The very fact of establishing a picket line is evidence of an intention to annoy, embarrass and intimidate, whether physical violence is resorted to or not. There have been a few cases where it was held that picketing, by a labor union, of a place of business is not necessarily unlawful if the pickets are peaceful and well behaved, but if the watching and besetting of the workmen is carried to such a length as to constitute an annoyance to them or their employer it becomes unlawful. But manifestly that is not a safe rule and furnishes no fixed or certain standard of what is lawful or unlawful. Any picket line must result in annoyance both to the employer and

the workmen, no matter what is said or done, and to say that the court is to determine by the degree of annoyance whether it shall be stopped or not would furnish no guide, but leave the question to the individual notions or bias of the particular judge. To picket the complainants' premises was in itself an act of intimidation and an unwarrantable interference with their rights. Pickets were, in fact, guilty of actual intimidation and threats, but if they had not been, the complainants were entitled to be protected from the annoyance.''

In the *Kemp* case, *supra,* nonunion employees filed a bill against union employees to restrain the union and its officers from calling a strike of its members, the purpose of the injunction being to prevent the union employees of the street railway company from quitting their employment in accordance with a vote previously taken by them. The injunction was denied for the reason as stated by Mr. Justice Carter (p. 252) that it would be, ''in effect, to compel them to continue in their employer's service unwillingly.''

In *Iron Molders' Union v. Allis-Chalmers Co., supra,* the defendants were enjoined, ''from congregating upon or about the company's premises or the sidewalk, streets, alleys or approaches adjoining or adjacent to or leading to said premises, and from picketing the said complainant's places of business or the homes or boarding houses or residences of the said complainant's employees.'' In passing on this provision of the decree, Judge Baker, speaking for the United States Court of Appeals, said (p. 51): ''With respect to picketing as well as persuasion, we think the decree went beyond the line. The right to persuade new men to quit or decline employment is of little worth unless the strikers may ascertain who are the men that their late employer has persuaded or is attempting to persuade to accept employment. Under the name of persuasion, duress may be used; but it is duress, not persua-

sion, that should be restrained and punished. In the guise of picketing, strikers may obstruct and annoy the new men, and by insult and menacing attitude intimidate them as effectually as by physical assault. But from the evidence it can always be determined whether the efforts of the pickets are limited to getting into communication with the new men for the purpose of presenting arguments and appeals to their free judgments. Prohibitions of persuasion and picketing, as such, should not be included in the decree.''

Cases from other jurisdictions have been cited which hold that peaceful picketing is not unlawful, but so far as we have been able to ascertain, the law in this State in reference to picketing as announced in the *Barnes* case, *supra,* has not been changed. The evidence shows that the pickets in patrolling the street stated that there was a strike on at Henrici's. A strike is defined to be: ''A combined effort by workmen to obtain higher wages or other concessions from their employers, by stopping work at a preconcerted time.'' (*Bouvier's Law Dict.*) ''The act of a body of workmen employed by the same master, in stopping work all together at a prearranged time, and refusing to continue until higher wages, or shorter time, or some other concession is granted.'' (*Black's Law Dict.*) ''A concerted or general quitting of work by a body of men or women for the purpose of coercing their employer in some way, as when higher wages or shorter hours are demanded, or a reduction of wages is resisted; a general refusal to work as a coercive measure.'' (*Century Dict.*) In the case at bar, we are clearly of the opinion that there was no strike as a matter of fact. So far as the evidence shows, none of the complainant's employees had made any complaint (before the resolution was passed by the unions calling the strike) as to the amount of wages, number of hours worked, or any other matter, nor did any of the waitresses quit their employment on account of the

calling of the strike; and made no complaint at any time and, therefore, the statements as made by the pickets, ''There is a strike on at Henrici's,'' ''We want $8 for six days' work,'' ''Don't eat under police protection,'' were not justified by the facts, and these, together with the patrolling, constituted picketing which tended unlawfully to interfere with complainant's business and was therefore properly enjoined.

Counsel for both parties contend that the decree is ambiguous, in that the rights of the parties are not clearly defined. The decree enjoins picketing and patrolling the complainant's place of business and then qualifies the same by the following language: ''In such a manner as to intimidate, threaten or coerce any person or persons from entering or who may desire to enter said premises for the purpose of patronizing the Complainant, or for any lawful purpose whatsoever.'' In this qualification the court erred. We are of the opinion that under the facts in this case, the manner of picketing as shown by the evidence was not justified and should be enjoined. The decree will, therefore, be modified by striking therefrom the following words: ''In such a manner as to intimidate, threaten or coerce any person or persons from entering or who may desire to enter said premises for the purpose of patronizing the Complainant, or for any lawful purpose whatsoever,'' and as so modified the decree of the Circuit Court is affirmed.

*Decree modified and affirmed.*

MR. JUSTICE GOODWIN concurring in part and dissenting in part.

Unfortunately, I feel constrained to dissent from the conclusions of the court in this case, so far as they result in a modification of the decree entered in the Circuit Court. Upon the disputed questions of fact I must, of course, concur in holding that as the learned chancellors saw and heard the witnesses, and as their

findings in regard to the facts can in no way be said to be clearly against the weight of the evidence, they are binding on this court.

Upon the question as to whether picketing or patrolling is ever lawful, however, I am persuaded that the reasoning of the distinguished jurist in *Iron Molders' Union v. Allis-Chalmers Co.,* discussed in the opinion of the court, is correct. Certainly picketing, as applied to a labor controversy, has no definite and precise meaning; consequently judges differ in regard to the question of whether picketing is absolutely and unqualifiedly unlawful, to just the extent to which they differ as to the meaning of the term. There does not appear to be a difference in regard to any substantive principle of law expressed in the opinions in the *Barnes* case, *supra,* and in the case of *Iron Molders' Union v. Allis-Chalmers Co., supra,* but rather a difference in regard to the meaning of a term employed in the respective decrees. Both emphatically agree that the stationing of men for purposes of violence and intimidation should be enjoined; in the first, the position is taken that the term "picketing" necessarily includes an intention to intimidate; in the second it is held that it does not. While it seems preferable to avoid the use of a term of such inexactness, the decree does, nevertheless, by the addition of the qualifying words (which are rejected by the majority of this court) give it the definiteness and exactness of expression which, in my opinion, the law requires. The criticism of the decree urged by both sides on account of the general language employed, however, appears to be not without some justification. In view of the volume of evidence taken, it would seem that it was possible for the chancellors to define and describe with great particularity the exact character of the acts to be enjoined. This was a matter of perhaps greater importance to the defendants than to the complainant.

It appears, nevertheless, that the language used was

sufficiently clear to inform the defendants in the present instance, at least, of what was prohibited, and that did not go beyond what was justified by the findings of fact which, as we have already indicated, we are not at liberty, under the law, to disregard. So far as complainant is concerned, on the other hand, the decree gave it a full measure of protection against unlawful interference with its business, which was all that it was entitled to. It had no right to have that protection expressed in any particular phraseology. For these reasons I believe that the decree should be affirmed without modification.