### GREAT NORTHERN RY. CO. v. BROSSEAU et al.

(District Court, D. North Dakota, N. E. D.   January 8, 1923.)

1. **Injunction ⬯⬯204—Proper form in strike cases indicated.**

Practice of issuing writs of injunction in form prepared by attorneys condemned, and proper form given.

2. **Injunction ⬯⬯145—Affidavits for, condemned.**

Practice of issuing injunctions on affidavits disapproved; oral evidence of principal witnesses should be produced, whenever possible.

3. **Strikes—Private detectives.**

Use of private detectives in theater of strikes condemned, and need for disinterested public officers pointed out.

4. **Clayton Act—English act of 1906.**

Clayton Act and English Trades Dispute Act of 1906, from which our statute was taken, compared, and different results of same law in the two countries pointed out.

5. **Injunction ⬯⬯101(2)—Striking employés not authorized to go on property of employer to communicate with new employés.**

Clayton Act, § 20 (Comp. St. § 1243d), providing that no injunction shall be granted to prohibit "any person or persons * * * from attending at any place, where such person or persons may lawfully be, for the purpose of peacefully obtaining or communicating information, or from peacefully persuading any person to work or to abstain from working," does not authorize striking railroad employés to go on the property of the company, without its consent, for such purposes.

6. **Injunction ⬯⬯189—Limitation of number of pickets by strikers.**

In dealing with a strike of railroad shopmen, the number of pickets permitted by the strikers at points of ingress and egress to or from the shop yards of complainant limited by the court to three.

7. **Injunction ⬯⬯101(1)—"Irreparable injury," which warrants injunction, in strike cases.**

"Irreparable injury," necessary to support injunctive relief against striking employés, under Clayton Act, § 17 et seq. (Comp. St. § 1243a et seq.), does not mean such irreparable injury as is the natural and inevitable result of the strike, but embraces only direct injuries to new employés or to the property of the employer by acts of trespass or violence, or obstruction of the employer in obtaining new employés by means of threats, abuse, or violence.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Irreparable Injury.]

8. **Clayton Act—Nullification by many United States District Courts.**

The practical nullification of the Clayton Act by many United States District Courts pointed out and condemned.

9. **Injunction ⬯⬯101(1)—Prerequisites to injunction under Clayton Act stated.**

Existence of such a controversy as section 20 of Clayton Act specifies is a prerequisite to the rights which it confers.

---

⬯⬯For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Equity. Suit by the Great Northern Railway Company against Fred Brosseau and John Schimisik, respectively, chairman and secretary of the Brotherhood of Carmen, at Grand Forks, N. D., and others. Preliminary injunction granted.

Murphy & Toner, of Grand Forks, N. D., for plaintiff.
William Lemke, of Fargo, N. D., for defendants.

AMIDON, District Judge. This is a suit brought by plaintiff against defendants to restrain them from threats and acts of violence in connection with the strike of the railway shop crafts which was started on July 1, 1922. A temporary restraining order was issued, and has been continued in force after a full hearing until quite recently, when a preliminary injunction was issued. A large number of affidavits and a considerable body of oral evidence has been introduced upon the question of plaintiff's right to a preliminary injunction, and upon the several hearings in contempt proceedings for violations of the temporary restraining order. During the three months the case has been pending, and the different proceedings have been taken, the court has been called upon to investigate the law applicable to such a case, and a few matters that I have learned are of sufficient importance to justify their statement.

[1] Neither the restraining order nor the preliminary injunction prepared by counsel was signed by the court. During the 30 years that courts have been dealing with strikes by means of injunctions, these orders have steadily grown in length, complexity, and the vehemence of their rhetoric. They are full of the rich vocabulary of synonyms which is a part of our English language. They are also replete with superlative words and the superlative phrases of which the legal mind is fond. The result has been that such writs have steadily become more and more complex and prolix. All of this, it seems to me, is foreign to their legitimate purpose. They, like the proper bill in such cases, ought to arise out of the facts of each specific case. Injunctions are addressed to laymen. They ought to be so brief and plain that laymen can understand them. They ought to be framed in the fewest possible words. The order should not express the bias or violence of a party to such a controversy or his attorney. I therefore framed the orders in this case with these objects in view. The purpose ought to be to state the specific acts that are forbidden. It also helps to show where the line separating wrong from right conduct lies, to state what acts are not forbidden. So I attempted to do that in the orders that were issued. A copy of the restraining part of the injunction will be found in the margin.[1] The result has been that the strikers have been able to understand the orders, and have shown a keen desire to do so and obey them. The officers of the union in charge of the strike, and a great majority of the men, have joined with the peace officers in a sincere effort to conduct the strike in a lawful and orderly manner. A few cases of alleged disobedience have been brought to the attention of the court, but many of these upon a hearing have been found to be without

[1] See note at end of case.

merit. I have been informed from time to time by deputy marshals who are stationed at each of the terminal points, that the strikers, with rare exceptions, were sincerely desirous of obeying the orders of the court and conducting the strike in a lawful manner.

[2, 3] The experience both upon the hearings as to whether a preliminary injunction should issue, and upon the contempt proceedings, have convinced me that affidavits are an untrustworthy guide for judicial action. That is the case in all legal proceedings, but it is peculiarly true of litigation growing out of a strike, where feelings on both sides are necessarily wrought up, and the desire for victory is likely to obscure nice moral questions and poison the minds of men by prejudice. Many of the affidavits submitted on behalf of plaintiffs have been made by private detectives or guards. As a class they are overzealous, through their desire to prove to the detective bureaus that they are efficient, and to the railway company that they are indispensable. Speaking generally, such detectives are mostly drawn from a class of people in large cities which would cause little credence to be given to their statements in ordinary litigation. The evidence that has come to me from wholly trustworthy sources in the present case satisfies me that the sooner public police officers are substituted for such private detectives, the better it will be for all parties concerned in strikes.

Early after the suit was brought, one or more deputy marshals were stationed at each of the terminal points of railway companies in the state. They were selected from civil life, and were wholly disconnected from either of the parties to the strike. They were men of mature years, good sense, and courage. I am satisfied that these officers have done more to maintain law and order than any other single influence. These public officers have been of great service to the court, in giving it disinterested reports as to all conflicts that have arisen.

Experience, as I have stated, has caused me to be so incredulous of affidavits that I have required in all important matters the presence of the chief witnesses upon each side at the hearing. These witnesses have been subjected to oral examination. The court has had a chance to observe their demeanor. A comparison of the picture produced by their testimony with that produced by their affidavits has proven the utter untrustworthiness of affidavits. Such documents are packed with falsehoods, or with half-truths, which in such a matter are more deceptive than deliberate falsehoods.

The most serious complaint that can be made against injunctions, which have become so prominent a part of the law in dealing with strikes in the United States, is the fact that courts have become accustomed to decide the most important questions of fact, often involving the citizen's liberty, upon this wholly untrustworthy class of proof.

In England, the acts which American courts are accustomed to restrain have been made crimes in the Conspiracy Statute of 1875 and its amendments. There injunctions have completely ceased in the theater of strikes. The acts having been made criminal, any party who is guilty of doing them is promptly arrested, tried, and, if found guilty, punished. If either party seeks an appeal in such a case, the appeal is heard inside of 30 days. The evidence is never printed, but a type-

written copy of it is certified up to the appellate court. The controverted questions of fact, if there be any, are usually reduced to a single point or two by experienced counsel, and the evidence itself is only looked at by the court in case counsel are unable to agree upon the facts. As a rule these criminal appeals are there disposed of in a few days after a judgment of guilty has been pronounced. In the most important cases the appeal is heard within 30 days, and final judgment rendered. There is no reason why a similarly prompt practice should not be established in our courts.

The Great Northern and Northern Pacific Railroads are both transcontinental lines passing entirely across this state. They both have numerous branch lines. The Northern Pacific has three terminal yards and repair points, and the Great Northern five. The Great Northern brought the present suit, and has had injunctive relief restraining the defendants in accordance with the provisions that are usually employed in such writs. The Northern Pacific has brought no suit, and has no injunctions. I have been kept as well informed by deputy marshals in the case of the Northern Pacific as in that of the Great Northern. I think, on the whole, there has been no material difference as to violation of the railway company's rights on the two lines. This experience convinces me that the injunction is a much less potent factor in maintaining good order than is usually believed.

[4] I have had occasion to make a careful study of section 20 of the Clayton Act (Comp. St. § 1243d) and section 2 of the English Trades Dispute Act of 1906. The reports of the judicial committee both of the House and the Senate state that the section of our statute referred to was copied from the English section. The form in which they are framed differs, but their legal effect is the same. The English statute says that "it shall be lawful" to do the specific acts mentioned in each of the statutes. This, as a necessary inference, forbade the courts to issue injunctions restraining workmen from doing those acts. The American statute reverses this order. It expressly forbids courts to issue injunctions or restraining orders forbidding workmen to do the acts specified in section 20, and then in its last clause declares as follows:

"Nor shall any of the acts specified in this paragraph be considered or held to be violations of any law of the United States."

Our statute forbids expressly the issuing of injunctions against the doing of the acts, and also declares that the doing of the same shall not be construed or held to be a violation of federal Law. The English act, without expressly dealing with the subject by forbidding injunctions, does so impliedly by conferring upon employés in the case of a trade dispute the right to do the acts. The only difference in the two statutes is that our law is express on the subject of forbidding injunctions in the cases specified, while the English statute accomplishes the same result by implication.

[5] I am convinced that the American statute does not authorize strikers to go upon the property of the company without its consent for the purpose "of attending at any place" where new employés may

be, "for the purpose of peacefully obtaining or communicating information, or peacefully persuading such new employés to abstain from working." That is the natural interpretation of the statute, and had been placed upon it before its adoption here. Slesser & Baker, "The Law of Trade Unions," p. 217.

The difference in the civil life habits of England and the United States results in widely different effects from the same statute in the two countries. In Great Britain strikers and the new employés are a part of the common life of the community. They mingle freely with one another. The opportunities for peaceful persuasion are a part of the daily intercourse. There the private armed detective is unknown. Nobody carries arms in England, but members of the army and navy; even policemen carry nothing but their sticks, and soldiers, in the rare cases in which they are called out to repress riots in connection with strikes, use nothing but their hand arms. In such a field the right of peaceful persuasion is natural and easy. It results sometimes in violent words, occasionally in violent acts with fists, and more rarely with bricks. The policemen, however, are quite equal to coping with such a situation. Guilty parties are promptly arrested, tried, and, if found guilty, promptly punished. The writ of injunction in strike cases has been unknown in England during the period when it has attained such universal use with us.

In the United States new workmen are recruited from fields remote from the strike. They are brought into the company's yards in cars. They sleep and eat on the ground, and are surrounded by a cordon of private detectives. This practice in no small degree nullifies the provisions of the Clayton Act (38 Stat. 730). There are no opportunities for peaceful persuasion. The new employés are schooled in the notion that if they leave the stockade they will be in imminent danger. The contrast between the situations in England and America presents an impressive example of how differently the same statute works in countries whose habits of life are different.

[6] In American Steel Foundries Co. v. Tri-State Central Trades Council, 257 U. S. 184, 42 Sup. Ct. 72, 66 L. Ed. 189, the number of pickets at any single point was limited to one. The court, however, is careful to state that no mathematical formula was intended for the purpose of all cases. Each case must depend to some extent upon the local situation. The danger of intimidation and attack is not confined to aggressions by strikers. The impartial history of strikes teaches that there is as much danger to strikers on the picket line from private detectives and sometimes from new employés, as there is of the same kind of wrong on the part of strikers against new employés. My experience in the present strike clearly confirms that view. The strikers on the picket line are entitled to have enough present to shield them against the temptation of their adversaries to resort to violent methods. They also need the same protection against trumped-up charges or unfair evidence relative to any assaults that may occur on either side. At the beginning of the present strike the pickets had large tents at important points of ingress to the company's property, and were accustomed to assemble there, especially in the nighttime, in large numbers.

I became convinced from the evidence that such tents, or the assembling of large numbers at or near the company's property, was a serious intimidation to workmen going about the yards in the necessary performance of their duties. I therefore required all such tents to be removed. The place for union men to meet for conference or in any considerable numbers is at their union hall. I limited the number of pickets at points of ingress and egress to three, and experience has justified that limitation as fair to both sides.

[7] The Clayton Act, in both sections 17 and 20 (Comp. St. §§ 1243a, 1243d), uses the words "irreparable injury," and declares that such injury is necessary to support injunctive relief. What is the meaning of these words as used in the statute? Every strike as its natural consequence causes irreparable injury to the employer, and if the employment is quasi public, it causes the same kind of injury to the public. That is the purpose of the strike, and the only sanction which gives it force. Notwithstanding this injury, Congress in express terms grants to employés the right to strike and to inflict such injuries. The Clayton Act was passed in 1914. Congress acted with a full knowledge of the disastrous consequences resulting from strikes, particularly in the case of coal mining and transportation. Notwithstanding these natural and inevitable injuries, the right of laboring men to strike has been fully maintained in statutes, and is a part of our equity jurisprudence, where that is not misinterpreted by the courts. That was the direct issue in the famous Jenkins injunction case. Farmers' Loan & Trust Co. v. Northern Pacific R. Co. (C. C.) 60 Fed. 803. There were special circumstances in that case for restraining a strike. The Northern Pacific Railroad Company was in the hands of receivers appointed by Judge Jenkins. As a result of the panic of 1893, those receivers reported to Judge Jenkins that it was necessary to reduce the wages of the railroad employés. A full hearing was had upon their petition, in which the railroad employés had participated and were represented by able counsel. After this hearing Judge Jenkins made an order directing that the wage scale of workmen on the road should be reduced. It was against that order, and the reduction in wages which it authorized, that the employés of the road threatened to strike. Judge Jenkins believed that the disastrous consequences of the strike to interstate commerce, and the carriage of mails, would be such that it was his duty to restrain the workmen from resorting to that method of redress, and issued an injunction forbidding them to strike. But the Circuit Court of Appeals, speaking by Mr. Justice Harlan of the Supreme Court, held this view to be wrong, and decided that in the economic struggle the right to strike was a weapon, a last and desperate weapon, which laboring men had the right to use for the purpose of securing what they believed to be just wages and wholesome conditions. Arthur v. Oakes, 63 Fed. 310, 11 C. C. A. 209, 25 L. R. A. 414.

The same considerations were present in the mind of Congress, as is shown by the reports of both the House of Representatives and the Senate, when the Clayton Act was passed. The whole subject had been dramatically presented in the railroad strike of 1894, and other similar strikes, and also in the great coal strike of 1902. Both strikes, even if

the strikers and those professing to act with them had refrained from every act of violence, would have caused the most appalling injuries, threatening not only the comfort, but the life, of vast numbers of people. The light in which Congress acted, and the numerous investigations which it had made, are fully referred to in the dissenting opinion of Mr. Justice Brandeis in Truax v. Corrigan, 257 U. S. 312, 368, 42 Sup. Ct. 124, 66 L. Ed. 254.

The constitutionality of the Clayton Act has not, so far as I know, been questioned in the Supreme Court. That court, on the contrary, in American Steel Foundries Co. v. Tri-State Central Trades Council, 257 U. S. 184, 42 Sup. Ct. 72, 66 L. Ed. 189, clearly indicates that it regards the statute, when properly construed, as constitutional. It reversed the decision of the trial court, because it issued an injunction "forbidding the ex-employés from persuading employés and would-be employés to leave or stay out of employment," on the ground that the decision of the trial court was in conflict with the Clayton Act. See 257 U. S. 208, 42 Sup. Ct. 78 (66 L. Ed. 189). There are several other features of this decision which by implication sustain its constitutionality.

Duplex Printing Co. v. Deering, 254 U. S. 443, 41 Sup. Ct. 172, 65 L. Ed. 349, 16 A. L. R. 196, by its whole course of reasoning, holds that the Clayton Act is constitutional, and, while the court decides that the statute does not legalize the secondary boycott, it does hold (1) that the last paragraph of section 20 forbids federal courts to enjoin the doing of any of the acts therein specified; (2) that the doing of any of those acts shall not be held to violate any law of the United States, such, for instance, as the Conspiracy Act or the Sherman Anti-Trust Law (Comp. St. §§ 8820–8823, 8827–8830).

[8] Notwithstanding the legislative history of the statute, and its highly remedial character, as indicated by its history and the reports of the committees having it in charge, many lower federal courts have studiously striven to disregard its plain language, as well as the actual intent of Congress, as disclosed by the history of the statute. Some have held that all strikes cause irreparable injury, and therefore the employer is entitled to an injunction to prevent such injury. Other courts have gone so far as to hold that the entire statute was a trick by Congress to so frame the measure that one part of it would nullify the other. Other courts have said there was no such thing as peaceful picketing, and hence no such thing as peaceful persuasion, and therefore the plain language of the statute must be disregarded by the court, and all picketing and all attempts by strikers to exercise their rights of peaceful persuasion were to be restrained, and injunctions have been accordingly issued. Other courts, notwithstanding the specific language of the last clause of section 20 that the doing of the acts which it permits should not be held to be in conflict with any federal law, have restrained strikes upon the ground that they violated the Sherman Anti-Trust Law and statutes forbidding the obstruction of the United States mails.

In my judgment, all such action by courts is a gross abuse of judicial power, and a direct refusal on their part to obey a statute which

was intended to limit their powers. It may be that the statute is economically and socially unwise, because of the vast injuries which strikes inflict upon society. Those considerations, however, are for Congress and not for the courts. There is no reason that a just court can assign why American courts should not have as cheerfully obeyed the Clayton Act as the English courts obeyed the Trades Disputes Act of 1906.

The capital objection to restraining workmen from striking is the futility of such injunctions. Even if the workmen obeyed the injunction, it would be possible and likely that they would perform their services in such a manner as would not promote the interest of their employers. Americans cannot be held permanently by an injunction in a state of peonage. This was the capital consideration that actuated the Circuit Court of Appeals in reversing the order of Judge Jenkins. It was one of the important motives which led Congress to pass the Clayton Act. There were other motives equally potent, as is shown by the legislative history referred to by Mr. Justice Brandeis in the Truax Case, which Congress thought justified them in granting to workmen all rights specified in the Clayton Act.

It must result from the foregoing that the irreparable injury referred to in the Clayton Act is something other and different from the irreparable injury to which I have referred above, and which is the natural result of a strike, and the sanction which gives it force. The history of trade disputes shows that these words are intended to embrace direct injuries to new employés, or to the property of the employer, by acts of trespass or violence, and also obstruction of the employer in obtaining new employés by means of threats, abuse, or violence—in a word, conduct which prevents by means of violence or duress the employer from carrying on his business.

These are the only legitimate fields for injunctive relief, and to gather up the natural and inevitable consequences of the strike, and use them as the basis of injunctive relief, is simply to proceed in a mental circle.

The injunction recently issued in Chicago, and the earlier one issued at Indianapolis, in connection with the bituminous coal strike, were not only in direct violation of the Clayton Act, as thus interpreted, but they carry government by injunction into new fields. They virtually hold that the power of courts to issue injunctions in strike cases, not only has no limits in equity jurisprudence, but that Congress cannot frame a law to limit this power which courts may not nullify by skillful construction.

The Transportation Act of 1920 (41 Stat. 456) begins the discussion of labor disputes at page 469. Section 313, at page 473, seems to be the only section as to violations of the board's decision, and a fair interpretation of the language there used makes the decisions of the board only advisory. That has been the holding of the courts. Section 402, subsections 10, 11, and 15, pp. 476 and 477, require car service to be safe and adequate, and the law provides in subsection 17 a penalty upon the carrier for failure to provide such service.

So far as I can discover, there is at the present time no statute in

force, except the Sherman Anti-Trust Act, making interference with interstate commerce a criminal offense. Such a statute was passed and approved August 10, 1917 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 8563 [9]), two months after we entered the Great War. It was a war measure. It provides that:

"Any person * * * who shall, during the war in which the United States is now engaged, knowingly and willfully, by physical force or intimidation by threats of physical force obstruct or retard * * * the orderly conduct or movement in the United States of interstate or foreign commerce, or the orderly makeup or movement or disposition of any train, or the movement or disposition of any locomotive car, or other vehicle on any railroad or elsewhere in the United States engaged in interstate or foreign commerce shall be deemed guilty of a misdemeanor, and for every such offense shall be punishable by a fine of not exceeding $100 or by imprisonment for not exceeding six months, or by both such fine and imprisonment."

Two things are noteworthy in this statute: (1) It is confined to the period of the war. (2) It is narrowly limited to "physical force or intimidation by threats of physical force."

These limitations, both as to time and the character of the act, throw a clear light upon the intent of Congress not to interfere with the Clayton Act, save to the extent thus narrowly limited by the language of the statute. There is also a proviso attached for the purpose of removing all doubt, stating that nothing in the section "shall be construed to repeal, modify or affect either section 6 or section 20" of the Clayton Act.

This caution of Congress shows a wide difference between the view of Congress with respect to the Clayton Act and the views that have recently been expressed by courts.

[9] The right to do the acts specified in section 20 of the Clayton Law is conditioned upon the existence of such a controversy as the statute mentions. If railway employés quit the service in the absence of such controversy, and with the malevolent purpose of obstructing interstate commerce or the mails, this would be a violation of the Anti-Trust Act, and the conspiracy statute. Such a malevolent purpose, however, would have to be shown to be the primary intent of the strike. Given the existence of such a controversy as the law specifies, then the doing of the acts named in it is rightful, notwithstanding such conduct causes obstruction to commerce and the mails, and inflicts irreparable injury upon the company and the public. This must be true; otherwise, the right to do the acts would be wholly taken away as to employés on interstate railways. It is also true that, when such a controversy exists, the doing of the acts mentioned in section 20 ought to be presumed to have as their primary purpose the promotion of the employés' side of the controversy, and not the obstruction of the mails and interstate commerce. Nor can the doing of wrongful or criminal acts by single members or local groups be used to show a conspiracy on the part of the union or its officers to carry on the strike by such unlawful means. Such a conspiracy could only be shown either by clear proof of an agreement on the part of the union or its officers to use such means, or the abetting by them of those who were guilty of the unlawful con-

duct. In the absence of such proof, such unlawful deeds should be treated as showing the intent only of those using such wrongful means. Any other reasoning belies human experience, and nullifies the presumption against tortious or criminal conduct.

The present shopmen's strike affords conclusive proof of these views. No disinterested person who has come into immediate touch with the officers and members of the union has failed to be impressed with their purpose neither to use nor permit the use of wrongful means in carrying on the strike. The entire marshal's force in this district has repeatedly borne testimony to that effect. I cite a single instance. The city of Marmarth is the shop town on the main line of the Milwaukee road in this state. It is located on the extreme western boundary, in what is known as the "Bad Lands." On the return to the order to show cause why a preliminary injunction should not be issued, and after the strike had been going on for weeks, disinterested men of all classes, ministers, bankers, merchants, professional men, peace officers, and justices, gave affidavits that the period of the strike had been characterized by unusually good order, and that they knew, from their daily intercourse with union men and their officers, that such was their policy in carrying on the strike. And why should this not be true? It was the policy, not only of good citizenship, but of good sense. Any resort to violence would have stripped the union of all moral support from the public, and placed the strike under the ban of all good citizens. Of course, it is true that in national unions, like those in the railway service, having a membership running up into thousands and drawn from all sections of the country with our varying notions of law and order, a great variety in character and sense will be shown. There will be some hotheads, and a few who may be believers in dynamite and the dagger as a means of furthering the cause of working men.

I cannot conceive, however, of a graver injustice than to treat the acts of such individuals or groups as an index of the character or intent of any union in the railway service. Any person who is acquainted with these men will resent such an imputation. It is false to the creative influence of the great responsibilities which is the weft and woof of the railway service. It is likewise true that the underworld of our cities takes advantage of periods of public excitement, such as results from our large strikes, to resort to incendiarism and violence, because this creates the atmosphere in which they can plunder and pillage. Why should wrongs and crimes, whether done by hotheads in the union or by vicious outsiders, who claim to be their friends, be seized upon as an index of the character of the union or its officers? Why not deal with such wrongs and crimes as we do in other fields of life? Why not treat them as the acts of those who do them, or aid and abet such doers? Why not hunt down the guilty persons and punish them, and not impute their misdeeds to the striking union and its officers by a presumption which belies the known facts as well as the policy which common sense would dictate to the union and its officers as the only course for them to pursue? Just legal administration can give but one answer to these questions.

**NOTE.**

The restraining part of the injunction order is as follows:

"Ordered and adjudged that the defendants and all persons acting with them be and they are hereby enjoined and restrained as follows:

"1. From using threats or vulgar or abusive epithets or language towards plaintiff's employés, agents or officers, or towards persons about to become such.

"2. From injuring plaintiff's employés, agents or officers, or persons about to become such, or their families, or their property.

"3. From injuring any of plaintiff's property, personal or real, or any property or passengers in plaintiff's care, or being transported upon any of its lines.

"4. From trespassing upon plaintiff's property.

"5. From warning plaintiff's employés, agents or officers, or persons about to become such, or the families of either, that they will suffer or be likely to suffer any of the wrongs or injuries enjoined in this order, if they enter plaintiff's employment or continue therein.

"6. From aiding or advising any person to commit any of said wrongs or injuries.

7. From going upon or near plaintiff's said properties, or the homes of plaintiff's employés, agents or officers, for the purpose of doing any of said wrongs or injuries.

"8. From having and keeping at or near any point of ingress or egress to or from plaintiff's property more than three pickets, all other defendants and persons acting with them being restrained and enjoined from being present, and from assembling or loitering at or about any of said points or at or near plaintiff's property. If other persons desire to confer with pickets, they must choose occasions when they are not acting as pickets.

"A small tent may be erected at or near any point at which such pickets are stationed to protect them from the weather while they are on duty; but there must not be present at any such tent at any single time any one but the pickets who are there on duty. It is to be used by them and not by others.

"The defendants and those acting with them are enjoined from erecting or maintaining at or near plaintiff's property any other tents than those permitted by this section. If any other tents have been heretofore erected, they must be promptly removed.

"9. From attempting to do any of the acts above forbidden.

"This order does not enjoin or restrain the defendants, or persons acting with them, from using towards plaintiff's employés, or persons about to become such, language of peaceable persuasion or entreaty, for the purpose of inducing them not to enter plaintiff's employment or to cease therefrom; nor does it restrain or enjoin the defendants or persons acting with them from peacefully imparting information to such employés of plaintiff or persons about to become such, for the purpose just specified; but this order is intended to and does enjoin and restrain the defendants and persons acting with them from doing any of the things hereinbefore forbidden in this order under the claim or pretense of using peaceful persuasion or entreaty, or peacefully imparting information. So long as the defendants and those acting with them confine themselves to a peaceful and orderly exercise of their rights specified in this section, the plaintiff, its officers, agents, employés and guards are enjoined from interfering with them, and particularly—

"1. From using towards them threatening or abusive language or epithets.

"2. From inflicting upon them any personal injuries or attempting to do so.

"3. The armed guards of plaintiff are enjoined specifically from drawing or exhibiting firearms or other dangerous weapons, for the purpose of intimidating such pickets, and from using firearms or other dangerous weapons at all except in the presence of imminent peril such as threatens very serious injury to the person of the party using such weapons, or others in the employ of the company, or to resist the imminent and immediate danger of the destruction of personal property or injury to engines or switches, or any other similar property that would imperil the public in using the company's railway, or the employés of plaintiff in the prosecution of its business, and on such

occasions from using said firearms or other dangerous weapons when there is any other reasonable means of preventing the aforesaid wrongful acts.

"It is further ordered that a copy of this preliminary injunction shall be mailed to each of the defendants and to all persons known to be acting with them, at his present address, in so far as such address can reasonably be ascertained, and that ten copies of said order be posted in conspicuous public places in the vicinity of the roundhouse, shops, yards and other property of the Great Northern Railway Company, in each of the following places in North Dakota, namely, New Rockford, Devils Lake, Grand Forks, Minot and Williston, and that a copy of this preliminary injunction be also mailed to the principal officers and agents of the plaintiff, and each of the special guards employed by plaintiff, at the points above mentioned; that such mailing and posting be done by the United States marshal for the district of North Dakota.

"That a copy of this preliminary injunction may also be published in a newspaper published in the places above specified, which publication shall be attended to by said Great Northern Railway Company or its representative.

"It is further ordered, that any person who shall tear down, deface, destroy, or in any manner interfere with any of the copies of this preliminary injunction that shall be posted pursuant to this order, shall be held in contempt of this court, and shall be punished accordingly."