Max Rosen, Trading as Western Slipper Manufacturing Company, Appellee, v. United Shoe and Leather Workers Union Local 48 et al., Appellants.

Gen. No. 38,882.

Opinion filed November 2, 1936.

Rehearing denied November 16, 1936.

JOSEPH M. JACOBS, of Chicago, for appellants.

HAROLD L. LEVY and LAWRENCE S. JACOBSON, both of Chicago, for appellee; LAWRENCE S. JACOBSON, of counsel.

MR. PRESIDING JUSTICE MATCHETT delivered the opinion of the court.

Rosen, the plaintiff, who is engaged in the business of manufacturing and selling women's and men's slippers, operates a shop located on Blue Island avenue in Chicago. He owns the premises, which are improved with a three-story building. The shop is on the first floor; the upper floors are occupied by plaintiff's family

and the families of two tenants. The front entrance is from the street, Blue Island avenue, and there is a rear entrance from the alley. The premises are worth about $8,000, and the machinery in the shop where the business is conducted is of the same value. Plaintiff employs about 14 workers and transacts a business which amounts to about $40,000 annually.

November 29, 1935, plaintiff filed a bill duly verified against the United Shoe and Leather Workers Union Local 48 and certain employees thereof, most of whom were persons formerly employed by him in his business, charging that these defendants on or about October 25, 1935, entered into a conspiracy to injure and destroy his business and perform other illegal acts; that in furtherance of these designs pickets were stationed in front of his place of business with signs stating that the "employer refused to bargain collectively with his employees"; that members of the Union congregated in the vicinity of the ship throughout the day; that defendants accosted prospective employees and by threats and intimidations barred them from entering plaintiff's shop. The bill recited specific instances of vile language, intimidations, assaults, etc., which often exist where an industrial strike is being carried on.

The bill prayed that other persons also conspiring might, when discovered, be made parties; that the defendants should answer, but not under oath; that a temporary injunction might issue immediately upon the filing of the complaint, and upon final hearing be made permanent, "restraining the said defendants and each of them, and all associations, firms and persons assisting, aiding, confederating or conspiring with them, or having knowledge of said injunction,"

"(a). From picketing or maintaining any picket or pickets at or near the place of business of the plaintiff, Max Rosen, doing business as Western Slipper Manufacturing Company, located at 1324 Blue Island avenue, Chicago, Cook county, Illinois.

"(b) From patroling or congregating in front or in the vicinity of the said place of business of the plaintiff, Max Rosen, in furtherance of such picketing.

"(c) From exhibiting or causing to be exhibited any sign, placard or other matter in front of or in the vicinity of the said place of business of the plaintiff, designating the plaintiff's said place of business as being non-union or unfair to organized labor, or as refusing to permit collective bargaining, or designed to induce or influence persons not to enter the plaintiff's place of business.

"(d) From soliciting, inducing or influencing or attempting to induce or influence persons, employees or prospective employees of the said plaintiff not to enter the plaintiff's said place of business.

"(e) From menacing, intimidating, threatening or harassing persons employed by, or persons going to and from the plaintiff's said place of business; from calling the plaintiff and members of the plaintiff's family, and the plaintiff's employees vile names and shouting offensive epithets.

"(f) From threatening, coercing, intimidating or assaulting the employees of the plaintiff, or harassing the employees of the plaintiff while on their way to and from their homes to the plaintiff's place of business.

"(g) From threatening, coercing, intimidating or assaulting prospective employees, or persons seeking employment from the plaintiff; and from preventing by threats, coercion or intimidation such prospective employees and persons seeking employment with the plaintiff from entering the plaintiff's place of business.

"(h) From advising, encouraging or assisting or participating in the doing of any of the things which are herein forbidden."

Certain affidavits were submitted in support of the preliminary injunction, which was granted as prayed. Defendants answered the bill admitting that pickets had been placed before plaintiff's place of business, but

denying in detail all use of force, intimidation, offensive language, etc. The cause was heard by the chancellor in open court, and on December 16, 1935, a decree was entered finding that the material allegations of plaintiff's complaint were true, and the equities with plaintiff, "that there is not now and has not been at any time in the past, any dispute between the plaintiff and the defendants herein concerning terms or conditions of employment, and that this cause is not a case involving or growing out of a dispute between the plaintiff and the defendants herein concerning terms or conditions of employment." It was therefore adjudged that the temporary injunction issued in the cause should be made absolute, perpetual and permanent. The decree sets out, substantially in the language of the prayer as heretofore recited, the things which defendants are enjoined from doing. The defendants bring this appeal contending among other things that the injunction violates the Anti-Injunction Act of 1925 (see Illinois State Bar Stats. 1935, ch. 22, ¶ 58, p. 237). That Act in substance provides that no injunction shall be granted in this State "in any case involving or growing out of a dispute concerning terms or conditions of employment . . . from ceasing to perform any work or labor, or from peaceably and without threats or intimidation recommending, advising, or persuading others so to do; or from peaceably and without threats or intimidation being upon any public street, or thoroughfare or highway for the purpose of obtaining or communicating information, or to peaceably and without threats or intimidation persuade any person or persons to work or to abstain from working, or to employ or to peaceably and without threats or intimidation cease to employ any party to a labor dispute, or to recommend, advise, or persuade others so to do."

The bill is framed upon the theory that the defendants are guilty of an illegal and unlawful conspiracy, and the decree, as recited above, expressly finds that there has not been at any time in the past, any dispute between plaintiff and defendants concerning terms or conditions of employment, and that the cause is therefore not one growing out of a dispute concerning terms or conditions of employment. The necessary inference is that the statute is not applicable, and that the plans and purposes of the defendants being illegal and unlawful, any act done in pursuance thereof, however innocent in itself, is also unlawful.

The distinction between a strike begun for a lawful as distinguished from a strike begun for an unlawful purpose, is vital and controlling. Whatever doubts may have been hitherto entertained by the courts as to whether there may be peaceable and lawful picketing as stated in *Philip Henrici Co. v. Alexander,* 198 Ill. App. 568, has been finally settled in this State by the Anti-Injunction Act construed and held valid in *Fenske Bros., Inc. v. Upholsterers International Union of North America,* 358 Ill. 239, and the law now is that there may be such peaceable and lawful picketing. The same result has been reached in Federal jurisdictions, construing the Clayton Act, as illustrated in *American Steel Foundries v. Tri-City Central Trades Council,* 238 Fed. 728, C. C. A. 7th 1916 (as modified in 257 U. S. 184). Section 20 of the Clayton Act there considered was apparently copied from section 2 of the England Trades Dispute Act of 1906. The English act, as the opinion in *Great Northern Ry. Co. v. Brosseau,* 286 Fed. 414, points out, describes the specific acts which striking workmen may do, and expressly forbids any injunction directing that workmen shall refrain from doing them. The social theory upon which these statutes are based was well stated by

Judge Baker in *Iron Molders' Union v. Allis-Chalmers Co.*, 166 Fed. 45, 91 C. C. A. 631, 20 L. R. A. (N. S.) 315, where the opinion says:

"For another thing that must not be forgotten is that a strike is one manifestation of the competition, the struggle for survival or place, that is inevitable in individualistic society. Dividends and wages must both come from the joint product of capital and labor. And in the struggle wherein each is seeking to hold or enlarge his ground, we believe it is fundamental that one and the same set of rules should govern the action of both contestants. For instance, employers may lock out (or threaten to lock out) employees at will, with the idea that idleness will force them to accept lower wages or more onerous conditions; and employees at will may strike (or threaten to strike), with the idea that idleness of the capital involved will force employers to grant better terms. These rights (or legitimate means of contest) are mutual and are fairly balanced against each other. Again, an employer of molders, having locked out his men, in order to effectuate the purpose of his lockout, may persuade (but not coerce) other foundrymen not to employ molders for higher wages or on better terms than those for which he made his stand, and not to take in his late employees at all, so that they may be forced back to his foundry at his own terms; and molders, having struck, in order to make their strike effective may persuade (but not coerce) other molders not to work for less wages or under worse conditions than those for which they struck, and not to work for their late employer at all, so that he may be forced to take them back into his foundry at their own terms. Here, also, the rights are mutual and fairly balanced."

The results of this conception of the mutual rights of the employer and the workmen in this industrial

welfare are far-reaching. 44 Harvard Law Review, 971.

The controlling question here, therefore, seems to turn upon the question of whether the strike which these workmen defendants conducted was begun and continued for a lawful purpose, namely, to the end that they might by collective action secure a larger share of the proceeds of the industry in which they were engaged, or whether it was begun with a design that was unlawful and illegal, namely, to injure their employer, or to secure for themselves illegal and unlawful benefits. If the purpose was lawful, they had the right to employ peaceable and lawful means to that end. If unlawful, even peaceful and lawful rights could not be perverted and used for unlawful and improper purposes.

We have examined the evidence bearing upon this question and find that the facts with reference to this issue are practically uncontradicted. In the first place, the plaintiff produced no evidence concerning the cause of the strike. His evidence seems to have been directed entirely toward proof of the things that occurred subsequently; that even if it is conceded unlawful acts were proved, such as use of vile names, intimidation and assaults (and we do not understand defendants to contend that the decree in this respect is against the preponderance of the evidence) this is not controlling nor conclusive. The general situation as to plaintiff's shop, kind of work, number of workmen, etc., have been already stated and need not be repeated. As to the particular circumstances under which the strike arose, Gallagher, one of the defendants, testified that he worked for the plaintiff for four years and eight months; that he was a man of family with ten children, eight of whom are living; that prior to the strike he joined the union and just before that

attended a meeting of slipper workers at which seven of his fellow employees were present. A second meeting was held at which there was a larger attendance, and at that meeting the organizer of the union, defendant Smith, was present for the first time. Gallagher was appointed chairman and acted in that capacity. Nine of the employees were present, and among them was one Peter Perlongo, who made a talk in which he said that slipper workers should have as high wages as picture operators, which was $125 a week. At this meeting also conditions and hours of service in the shop were discussed, and Gallagher, with two other employees of plaintiff, one of whom was Perlongo and the other Lazarovich, were appointed a committee to meet plaintiff and discuss these matters with him on the following day, and on that day, October 25, 1935, this committee called on Mr. Rosen, accompanied by the representative of the union and their own representative, Mr. Smith, and arranged for a meeting in his office on Sunday morning at 11 o'clock. Before that meeting occurred, Rosen talked with some of the workers and said to them, ''There will not be any meeting,'' and further said he wouldn't have anything to do with the committee at all, and that he didn't want to have anything to do with the organization. On Sunday almost all the slipper workers in his factory and several other slipper manufacturers appeared at the meeting. Peter Perlongo was absent, and Mr. Rosen did not appear. He was called up and gave as an excuse for not coming that he was ill, but apparently did not request that any other time should be fixed for the meeting. On the following day the strike was begun.

The evidence of all the defendant workers is to the effect that they were dissatisfied with conditions at the plant; that their wages had been cut at the beginning of the depression; that plaintiff had agreed to restore these wages but had not done so; that the workers

were required to work 72 hours a week; that toilet facilities at the plant were inadequate; that the work was done by piecework; that they received 90c a dozen for making the slippers. Other witnesses testified in substance to this same effect, and their evidence is not contradicted.

Charles H. Smith, the Chicago organizer for the union, testified that its present membership is between 69,000 and 70,000; that there are 81 local organizations; that the organizations extend from Bangor, Maine, to Los Angeles, California; that he first became acquainted with plaintiff's employees on October 24th; that at his meeting with defendant employees questions were taken up as to demands which should be made concerning standards of wages and hours in the industry; that they should try to get back some of the pay cuts heretofore given the workers; that he was introduced to their employer, who received him courteously; that he made the appointment for Sunday; that other employers appeared but Mr. Rosen was absent; that he talked with him on the 'phone and asked him if he would be there; that Rosen replied he was not feeling very good; he then asked Rosen if he would send a representative, but he did not do so. He warned plaintiff that it was a serious question, and that the workers would strike if they did not get some kind of satisfactory terms; that plaintiff replied he "didn't care whether there was a strike or not; he wasn't interested." This witness also testified that he was in charge of the strike, and that two pickets were placed on the line, and he denies any unlawful acts as alleged as against these pickets or the union. Other employees testified, and their testimony is not contradicted, that plaintiff called them into the office and threatened them with loss of their positions if they joined the union.

Without discussing all the evidence in detail, it is sufficient to say that it establishes by a preponderance that the finding in the decree to the effect that there had not been at any time in the past any dispute between plaintiff and defendants concerning terms or conditions of employment is not justified; that on the contrary, the cause presents a case involving or growing out of a dispute between the employer and the employees concerning terms or conditions of employment. It follows that the decree of the court, in so far as it forbids peaceful and lawful acts as directed in paragraphs (a) (b) (c) and (d) must be reversed. However lawful the purpose of the strike may have been, these employees had no right to resort to unlawful acts in furtherance of their cause. There is evidence that such unlawful acts were committed and therefore the decree as to paragraphs (e) (f) (g) and (h) should be affirmed. The decree is therefore affirmed in part and reversed in part, and the cause remanded for further proceedings consistent with this opinion.

*Affirmed in part; in part reversed and remanded.*

O'CONNOR and McSURELY, JJ., concur.